Michael **ALEXANDER,** et al.,
**Plaintiffs, Appellants,**

v.

**TRUSTEES OF BOSTON UNIVERSITY,**
et al., **Defendants, Appellees.**

Michael **ALEXANDER,**
**Plaintiff, Appellee,**

v.

**TRUSTEES OF BOSTON UNIVERSITY,**
et al., **Defendants, Appellees.**

Selective Service System, et al.,
**Defendants, Appellants.**

Nos. 84–1712, 84–1713.

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 1985.

Decided June 25, 1985.

Breyer, Circuit Judge, dissented and filed opinion.

William G. Southard, Boston, Mass., with whom E. Susan Garsh, James B. Re, Bingham, Dana & Gould, John Reinstein and Marjorie Heins, Massachusetts Civil Liberties Union Foundation, Boston, Mass., were on brief for Michael Alexander.

Robert V. Zener, Washington, D.C., with whom Leonard Schaitman, Richard K. Willard, Acting Asst. Attys. Gen., Washington, D.C., and William F. Weld, U.S. Atty., Boston, Mass., were on brief for Selective Service System.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and GIGNOUX,[*] Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This case was brought in the district court by three registration-exempt Boston University theological students who were refused federal financial assistance after they declined to answer questions as to their draft registration status on an aid application form that was prescribed by the United States Department of Education ("DOE"). Concluding that Congress had not authorized DOE to condition registration-exempt students' receipt of aid on their completion of these forms, the district court enjoined the denial of aid to the three students. Defendants have appealed, and the three plaintiffs have cross-appealed both from the court's refusal to certify a class and its limitation of injunctive relief to themselves only.

At issue is whether the district court erred in ruling that the regulations adopted by DOE, which require all aid applicants to file a statement indicating either that they have registered for the draft or are exempt, and which deny aid to those who do not comply, exceeds the statutory authority granted to DOE by the Solomon Amendment ("the Amendment"). Plaintiffs are all exempt from draft registration, either on account of gender or age, but object because of religious scruples to filling out and filing a form of this sort, regarding

* Of the District of Maine, sitting by designation.

such acts as cooperation with a program of military conscription.

### I.

An explanation of the statutory and regulatory context will assist in understanding this controversy. The Solomon Amendment to the Military Selective Service Act, 50 U.S.C.App. § 462(f),[1] provides that students who are required to register with the Selective Service and fail to do so are ineligible for federal student aid under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.* 50 U.S.C.App. § 462(f)(1). The Solomon Amendment further provides that persons required to register must file with their schools a "statement of compliance" with registration requirements in order to receive aid. *Id.* § 462(f)(2).

The Secretary of Education, in accordance with the Amendment's directive to "issue regulations to implement the requirements of this subsection," *id.* § 462(f)(4), promulgated regulations[2] re-

---

**1.  § 462.  Offenses and penalties**

\*     \*     \*     \*     \*     \*

(f)(1) Any person who is required under section 3 [section 453 of this Appendix] to present himself for and submit to registration under such section and fails to do so in accordance with any proclamation issued under such section, or in accordance with any rule or regulation issued under such section, shall be ineligible for any form of assistance or benefit provided under title IV of the Higher Education Act of 1965 [section 1070 et seq. of Title 20].

(2) In order to receive any grant, loan, or work assistance under title IV of the Higher Education Act of 1965 (20 U.S.C. 1070 et seq.) [section 1070 et seq. of Title 20], a person who is required under section 3 [section 453 of this Appendix] to present himself for and submit to registration under such section shall file with the institution of higher education which the person intends to attend, or is attending, a statement of compliance with section 3 [section 453 of this Appendix] and regulations issued thereunder.

(3) The Secretary of Education, in agreement with the Director, shall prescribe methods for verifying such statements of compliance filed pursuant to paragraph (2). Such methods may include requiring institutions of higher education to provide a list to the Secretary of Education or to the Director of persons who have submitted such statements of compliance.

(4) The Secretary of Education, in consultation with the Director, shall issue regulations to implement the requirements of this subsection. Such regulations shall provide that any person to whom the Secretary of Education proposes to deny assistance or benefits under title IV [section 1070 et seq. of Title 20] for failure to meet the registration requirements of section 3 [section 453 of this Appendix] and regulations issued thereunder shall be given notice of the proposed denial and shall have a suitable period (of not less than thirty days) after such notice to provide the Secretary with information and materials establishing that he has complied with the registration require-

ment under section 3 [section 453 of this Appendix]. Such regulations shall also provide that the Secretary may afford such person an opportunity for a hearing to establish his compliance or for any other purpose.

**2.  § 668.24 Statement of registration compliance.**

(a)(1) Except as provided in paragraph (d) of this section, unless a student who is applying for title IV aid or, under the PLUS Program, who will benefit from the loan, files a Statement of registration Compliance with the institution, an institution may not, for a period of instruction beginning on or after July 1, 1983—

(i) Disburse funds to the student under any title IV student financial assistance program;

(ii) Certify the institutional portion of the application under the Guaranteed Student Loan or PLUS Program; or

(iii) Certify the institutional portion of the Pell Grant Request for Payment (ED Form 304), if the institution is participating in the Pell Grant Program under the Alternate Disbursement System.

(2) In the Statement of Registration Compliance, the student must certify either that he or she is registered with Selective Service or that, for a specified reason, he or she is not required to be registered.

. . . .

(d) The requirement under paragraph (a) of this section of filing a Statement of Registration Compliance ... does not apply to students who are—

(1) Enrolled in an officer procurement program, the curriculum of which has been approved by the Secretary of Defense at the following:

(i) The Citadel, Charleston, South Carolina.

(ii) North Georgia College, Dahlonega, Georgia.

(iii) Norwich University, Northfield, Vermont.

(iv) Virginia Military Institute, Lexington, Virginia; or

(2) Unable to present themselves for registration for reasons beyond their control such

quiring every aid applicant (with minor, immaterial exceptions) to file a "Statement of Registration Compliance" ("the Statement") certifying "either that he or she is registered with Selective Service or that, for a specified reason, he or she is not required to be registered." 34 C.F.R. § 668.24(a)(2). If a student does not file

as being hospitalized, incarcerated, or institutionalized.

**3. STATEMENT OF EDUCATIONAL PURPOSE/REGISTRATION COMPLIANCE**

I certify that I will use any money I receive under the title IV student financial aid programs only for expenses related to attendance at (insert name of school) _____

and (check as appropriate)
—I certify that I am not required to be registered with Selective Service, because:
—I am a female.
—I am in the armed services on active duty (Note: Members of the Reserves and National Guard are not considered on active duty.)
—I have not reached my 18th birthday.
—I was born before 1960.
—I am a permanent resident of the Trust Territory of the Pacific Islands or the Northern Mariana Islands.
—I certify that I am registered with Selective Service.
Signature: _____

Date: _____

NOTICE: You will not receive title IV financial aid unless you complete this statement and, if required, give proof to your school of your registration compliance. If you purposely state falsely that you are registered or that you are not required to be registered, you may be subject to fine or imprisonment, or both. (20 U.S.C. 1091 and 50 U.S.C.App. 462).

**4.** A question was raised during oral argument whether two plaintiffs had substantially complied with DOE regulations by providing all the information necessary to determine their registration-exempt status, *i.e.*, that they were female, on other documents held by Boston University (*i.e.*, the Financial Aid Form, the Boston University Registration Form, the GRE Report of Scores, the Academic Record Boston University School of Theology), and by signing the "Statement of Educational Purpose/Registration Compliance," even though they wrote on the document, "I refuse to comply due to reasons of conscience" rather than checking off "I am a female."

After examining DOE's "*Q's & A's: Implementation of Selective Service Registration as a Criterion for Title IV Student Aid*," we conclude that

the Statement, the school "may not" provide any otherwise available aid to that student. *Id.* § 668.24(a)(1). The regulations also contain a model "Statement of Educational Purpose/Registration Compliance,"[3] which the Secretary regards "as satisfying the requirements of ... § 668.-24(a),"[4] 34 C.F.R. § 668.25, and which Bos-

nothing short of completion and submission of the Statement "suggested" in the regulations would have satisfied DOE, and its agent, Boston University. This document, sent out by Edward M. Elmendorf, Assistant Secretary for Postsecondary Education, and James W. Moore, Acting Deputy for Student Financial Assistance, in September of 1983 contains the following statement of DOE policy:

> 28) Q: If the student has signed the statement on the SAR but has not indicated his or her registration status by checking one of the boxes, is the Statement of Registration Compliance valid?
>
> A: No, the student may complete the Statement of Educational Purpose by signing the statement, but the Selective Service requirements of the April 11, 1983 regulations are not met unless the appropriate box of the Statement of Registration Compliance is checked.
>
> ....
>
> 32) Q: If an institution can identify a student's gender and/or age through already existing institutional records, must the student who is not required to register on the basis of gender or age still submit a statement of Registration Compliance?
>
> A: Yes, § 668.24(a) of the April 11, 1983 regulations requires that, in order to receive title IV aid, *all* students submit a Statement of Registration Compliance in which the student certifies either that he is registered or that, for a specified reason, he or she is not required to be registered.

We have been told that on December 12, 1984, DOE published proposed regulations on procedures for student assistance programs. In pertinent part, DOE noted,

> After the publication of the Student Assistance General Provisions regulation in the Federal Register of April 11, 1983, the Secretary received comments from student financial assistance administrators at various institutions questioning the need for a student to sign a Statement of Registration Compliance if the administrator can determine that the student is not required to register, e.g., the student is a woman.... In response to these comments, the Secretary seeks comments on the following ... proposal[ ] that [is] not included in the text of the proposed regulations:
>
> 1. Modify the requirement that all students must sign the Statement of Registration

ton University required all financial aid applicants to complete.

Two of the three plaintiffs are exempt from the requirements of military draft registration because they are women, and one is exempt because of his age. All three need federal financial aid, available under Title IV, to complete their training at the Boston University School of Theology as ministers in the United Methodist Church, but all three balked at submitting the "Statement of Educational Purpose/Registration Compliance" in order to secure the needed aid. They claimed that their religious beliefs prevented them from cooperating in any fashion with a system of military conscription.[5] One student submitted the Statement, under protest, while the other two refused to fill out the Statement and were, as a result, denied federal student aid.

After some preliminary skirmishing with Boston University, the students filed a complaint containing the issue presently before us in the United States District Court for the District of Massachusetts on January 18, 1984. They sought declaratory and injunctive relief and damages against the Trustees of Boston University, Dr. John R. Silber, individually and as President of Boston University, the Selective Service System and its Director, Major General Thomas K. Turnage, and the Department of Education and its Secretary, Terrel H. Bell. The complaint alleged three counts: (I) the DOE regulations, and Boston University's implementation of those regulations as an agent of the federal defendants, violated the plaintiffs' free exercise rights; (II) Silber's and Boston University's policy violated the plaintiffs' religious freedom rights under state constitutional and statutory law, and violated the Boston University Charter; and (III) the DOE regulations are inconsistent with and beyond the authority conferred by the Solomon Amendment because the regulations require persons who are not required to register to submit a Statement of Registration Compliance and deny Title IV aid to persons not subject to any registration requirement. Plaintiffs had also filed a motion for a preliminary injunction to restrain Boston University and the federal defendants from enforcing the DOE regulations.

On April 11, 1984, the court granted plaintiffs' motion for a preliminary injunction. The court ruled that the regulations were not "reasonably related to the enabling legislation," *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973), because the regulations imposed the "sanction" of denial of aid on a "potentially much larger group" than Congress intended. *Alexander v. Trustees of Boston University*, 584 F.Supp. 282, 283, 285 (D.Mass. 1984). The court also believed that the Secretary overstepped his authority because the regulations "needlessly conflict with the Title IV educational aid program." *Id.* at 286. The court stated that "unsupported" assertions of possible delay and expense accruing from other means of determining an applicant's draft status did

---

Compliance to permit an institution the option of not requiring a student to sign that Statement if the institution can determine that the student is exempt from registration (for example, if the student is female or out of the age range for registration). However, if the institution does not require a student to sign the Statement because it determined that the student was exempt from the registration requirement and the institution is incorrect in its determination, the institution will become liable for any Title IV, HEA program funds paid to the student.

49 Fed.Reg. 48,494, 48,499 (Dec. 12, 1984). This proposal does not moot this case as to the 1983–84 academic year here at issue because even if it were to be issued as a final regulation after the appropriate comment, decision, and drafting periods, it would not be effective for that year.

**5.** In their complaint, the plaintiffs noted that their refusal to cooperate was

consonant with and founded upon the teachings of the United Methodist Church, which, in its Book of Discipline, rejects "coercion, violence, and war ... as incompatible with the gospel and spirit of Christ," which supports "those individuals who conscientiously oppose all war, or any particular war, and who therefore refuse to serve in the armed forces or to cooperate with any system of military conscription."

not justify DOE's overstepping the power delegated it by Congress. *Id.* at 285.

> The district court went on to say that denying aid to fully qualified persons simply because they fail to file the statement is disproportionately harsh. Even when an administrative agency is authorized by statute to impose sanctions, a court may overturn that decision if it finds the sanction " 'unwarranted in law or ... without justification in fact.' " *Butz v. Glover Livestock Commission,* 411 U.S. 182, 185–86 [93 S.Ct. 1455, 1458, 36 L.Ed.2d 142], *reh. denied,* 412 U.S. 933 [93 S.Ct. 2746, 37 L.Ed.2d 162] (1973).

*Id.* The court singled out two characteristics of the regulatory "sanction"[6] that made it disproportionately harsh and required a finding that the Secretary's action was "unwarranted by law and so far beyond delegated authority as to be arbitrary and capricious." *Id.* First, the Secretary has required application of the "sanction" of aid denial to those who fully qualified for benefits under statutory standards. *Id.* Second, the court noted that,

> Denying aid to those whose only defense is refusal out of religious conviction to fill out a form stating that they are not required to register raises serious constitutional questions. I cannot conclude that Congress, after fully considering the constitutional implications of its own narrowly defined action, then delegated authority to the Secretary to make regula-

tions of broader sweep that raise more troublesome constitutional problems.

*Id.* at 286.

The court declined to consider the federal constitutional and state law arguments raised by plaintiffs in Counts I and II. It enjoined the federal defendants[7] solely because the DOE regulations went beyond the enabling statute (Count III).

In response to the court's order of April 11, 1984 directing the parties to confer on the form of the injunction to be entered, plaintiffs submitted a proposed order that would have enjoined the federal defendants from requiring *"any* applicant for federal educational aid who is exempt from any requirement of draft registration ... *to submit information* regarding such applicant's exempt status and from denying federal educational aid to any such person for *failure to submit information* concerning draft registration status." (Emphasis added.) Defendants objected to the broad scope of the proposed order. The court found that plaintiffs' proposed order was beyond the court's jurisdictional powers and issued a much narrower injunction:

> Defendant United States Department of Education, Terrel H. Bell, Secretary, Selective Service System, Major General Thomas K. Turnage, Director, and their respective agents, ... and all persons acting by, through, for or in concert with them, are hereby enjoined, pending final judgment in this action, from withholding

---

**6.** The court repeatedly emphasized that it was not the information requirement, but rather the unauthorized, severe "penalty" for non-compliance that troubled it most:

> This is not to say that, in the administration of this program, educational institutions are forbidden to request, or the Secretary is forbidden to require by regulation that they request, cooperation of financial aid applicants in the form this regulation defines. It is to say, however, that the Secretary has exceeded the Congressional authorization in imposing the penalty for noncooperation that this regulation imposes.

*Alexander,* 584 F.Supp. at 286.

**7.** The district court stated:

> Before proceeding to the plaintiffs' request for preliminary relief, I note that BU has

indicated that, should the actions of the federal defendants in denying aid to plaintiffs be enjoined, BU will conform its policy to that order. Since one asserted basis for BU's decision to deny its aid to plaintiffs is their failure to obtain federal aid first, the injunction against federal defendants will satisfy that concern. The claims against BU present difficult issues of interpreting state law, which I will not unnecessarily attempt to resolve. Therefore, I defer decision on the prayer for preliminary injunction against BU because of my understanding that such relief against BU will not be necessary. Should this understanding prove to be incorrect, plaintiffs may move for further relief.

*Alexander,* 584 F.Supp. at 288.

or delaying student financial assistance from plaintiffs under title IV of the Higher Education Act of 1965, 20 U.S.C. 1070 *et seq.*, by reason of the failure of plaintiffs to submit statements of registration compliance pursuant to 34 C.F.R. § 668.24 (1983)....

Both parties thereafter moved for summary judgment. Plaintiffs also moved for leave to amend their complaint "to include as plaintiffs all persons situated similarly to the present plaintiffs, and to amend their prayer for relief," and for certification of a Fed.R.Civ.P. 23(b)(2) class action on behalf of all registration-exempt persons who object to completing a Statement of Registration Compliance.

On June 6, 1984, the district court denied the federal defendants' motion for summary judgment and plaintiffs' motion to certify a class. The court, exercising its discretion, held the class action motion untimely because the court had already ruled favorably on plaintiffs' likelihood of success on the merits in its preliminary injunction decision, which involved the determination of legal questions likely to be dispositive of the entire case. It concluded that

> [a]llowing plaintiffs first to see whether they can obtain a favorable ruling and only after so doing then to expand their complaint into one seeking relief on behalf of a nationwide class is unfair to defendants and contrary to the spirit of the federal rules.

In response to defendants' summary judgment arguments, the court reconfirmed its decision of April 11, 1984. The court observed that the parties had "failed to respond to the court's request that they indicate whether they are ready for trial on the merits, not summary judgment." The court then again asked the parties to advise the court whether they were ready for trial, either on the affidavits already submitted or on the understanding that additional evidence would be submitted. As neither party indicated an interest in submitting further evidence, the court, on June 20, 1984, entered a permanent injunction on terms identical to the preliminary injunc-

tion and dismissed without prejudice Counts I and II of plaintiffs' complaint.

## II.

■ We first consider whether DOE exceeded its authority under the Solomon Amendment, 50 U.S.C.App. § 462(f)(4) in promulgating 34 C.F.R. § 668.24. A regulation must be " 'reasonably related to the purposes of the enabling legislation.' " *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969) ). It is in excess of authority if it "bears no relationship to any recognized concept" of the statutory terms at issue. *Batterton v. Francis*, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977). A regulation will be sustained if the "reviewing court [is] reasonably able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 308, 99 S.Ct. 1705, 1721, 60 L.Ed.2d 208 (1979). *See also Planned Parenthood Federation of America v. Heckler*, 712 F.2d 650, 655 (D.C.Cir.1983).

■ Plaintiffs contend that the regulation is ultra vires because the Solomon Amendment denies aid eligibility only to "[a]ny person who is required under section 3 ... to present himself for and submit to registration under such section and fails to do so"; and it likewise conditions receipt of Title IV benefits upon the filing of statements of compliance only in respect to "person[s] who [are] required under section 3 ... to present [themselves] for and submit to registration." 50 U.S.C.App. § 462(f)(1), (2) (quoted in full in note 1, *supra*). Because, due to their sex and age, plaintiffs are not required under section 3 to present themselves for and submit to registration, they argue that conditioning aid on their signing a statement attesting to their exempt status goes beyond the statute.

While superficially plausible, this argument is not persuasive. Concededly, the

statute's language is limited, and on its face affects a smaller group than do the regulations. But the fact that regulations cover individuals not included in the statutory scheme does not necessarily render them objectionable. *See Mourning*, 411 U.S. at 373–74, 93 S.Ct. at 1662–63.[8] As the above cited cases indicate, the relevant inquiry is whether the regulations are reasonably related to the purposes of the enabling legislation and can be said to have been within Congress's contemplation when it enacted the Solomon Amendment.

The purpose of the Solomon Amendment was "to deny federal educational assistance to those young men who were required to register for the draft, yet had not done so." *Alexander*, 584 F.Supp. at 284. *See also* 128 Cong.Rec. H4757 (daily ed. July 28, 1982) (Rep. Solomon); *id.* (Rep. Mitchell); *id.* at H4769 (Rep. Montgomery). By imposing this condition for educational aid eligibility, "Congress sought, not to punish anyone, but to promote compliance with the draft registration requirement and fairness in the allocation of scarce federal resources." *Selective Service System v. Minnesota Public Interest Research Group,* — U.S. ——, ——, 104 S.Ct. 3348, 3357–58, 82 L.Ed.2d 632 (1984) (footnote

---

**8.** In *Mourning,* the Supreme Court held that the Federal Reserve Board had not exceeded its authority under section 105 of the Truth in Lending Act, 15 U.S.C. § 1604, in promulgating that portion of Regulation Z known as the "Four Installment Rule." The Truth in Lending Act requires merchants who regularly extend credit, with attendant finance charges, to provide certain information "to each person to whom consumer credit is extended *and upon whom a finance charge is or may be imposed....*" 15 U.S.C. § 1631 (emphasis added). The Act also provides:

> The [Federal Reserve] Board shall prescribe regulations to carry out the purposes of [the Act]. These regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [the Act], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

*Id.* § 1604.

The Board promulgated Regulation Z, which requires disclosure of the statutorily specified information whenever credit is offered to a consumer "for which *either* a finance charge is or may be imposed *or* which pursuant to an agreement, *is or may be payable in more than four installments.*" 12 C.F.R. § 226.2(k) (emphasis added). The Supreme Court held that the "Four Installment Rule" was "reasonably related" to the purposes of the enabling legislation and therefore was valid. Most importantly for our purposes, the Court found the fact that the regulation subjects persons not targeted by the enabling legislation to the statutory disclosure requirements does not render it invalid. It stated:

> Since the deterrent effect of the challenged rule clearly implements the objectives of the Act, respondent's contention is reduced to a claim that the rule is void because it requires disclosure by some creditors who do not

charge for credit and thus need not be deterred. The fact that the regulation may affect such individuals does not impair its otherwise valid purpose. A similar contention was made in *Gemsco, [, Inc. v. Walling,* 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945) ], and rejected by the Court. Gemsco claimed that the Administrator was not attempting to enforce the requirements of the statute but was attempting to advance "experimental social legislation" which Congress had not approved. Responding to that argument the Court stated:

> "Section 8(f), in directing the Administrator to include 'such terms and conditions' as he 'finds necessary to carry out the purposes of such orders,' did not forbid him to take the only measures which would be effective, merely because other consequences necessarily would follow. The language neither states expressly nor implies that he is to do only what will achieve the stated ends and nothing more. The statute does not direct the Administrator to make the rate effective by all necessary means except those which may have other social or economic consequences." 324 U.S., at 257 [65 S.Ct., at 613].

There the Court was referring to the regulation of subject matter not specifically mentioned in the enabling legislation. A similar rule applies when a remedial provision requires some individuals to submit to regulation who do not participate in the conduct the legislation was intended to deter or control. In *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388–389 [47 S.Ct. 114, 118, 71 L.Ed. 303] (1926), the Court held that, in defining a class subject to regulation, "[t]he inclusion of a reasonable margin to insure effective enforcement, will not put upon a law, otherwise valid, the stamp of invalidity." See also *North American Co. v. SEC,* 327 U.S. 686 [66 S.Ct. 785, 90 L.Ed. 945] (1946).

411 U.S. at 373–74, 93 S.Ct. at 1663.

omitted) (holding, *inter alia*, Solomon Amendment is not a Bill of Attainder).[9]

To carry out this purpose, the Secretary must ascertain whether each aid applicant is a person required to register and, if so, whether the applicant has in fact registered. Manifestly, the easiest, most efficient, method to obtain the requisite information is simply to ask the applicant.[10] We do not believe an agency charged with dispensing governmental program benefits needs explicit authority to ask those persons seeking such benefits whether they qualify for them. All plaintiffs were required to do was indicate that they were not required to register for the draft because they were females or fit within a certain age group.

The form in question elicits the relevant information with a minimum of fuss and inconvenience. It is short and clear, requiring minimal effort to complete. It has the virtue, from an administrator's standpoint, of compiling all necessary information on one easily processed piece of paper. And the information in issue, age and sex, is rudimentary, commonplace data solicited from most of us on countless occasions. We have little doubt that asking applicants to give this information on this form was a direct and efficient means of implementing the statute, thereby furthering its purpose.

Plaintiffs distinguish between the Secretary's right to *ask* aid applicants to fill out this informational form, and his authority to refuse aid to applicants who will not do so. They argue that the Secretary has no authority to extend the Solomon Amendment's "sanction" aimed at "lawbreakers" to a class of individuals who qualify for Title IV aid under all statutory eligibility requirements and who are in compliance with registration laws. The district court in essence accepted this characterization of the purpose and effect of the statute and regulations when it held that the denial of aid to plaintiffs was a "disproportionately harsh" administrative "sanction." *Alexander*, 584 F.Supp. at 285.

We disagree. No sanction, as such, is involved,[11] nor are plaintiffs being denied

---

**9.** *See also* 128 Cong.Rec. H4758 (daily ed. July 28, 1982) (Rep. Solomon) (intended to induce eligible individuals to register); 129 Cong.Rec. S4944–45 (daily ed. May 12, 1982) (Sens. Hayakawa and Jepson) ("chief purpose" of the law is to encourage registration); 128 Cong. Rec. H4757 (daily ed. July 28, 1982) (Rep. Mitchell) (if they don't "think enough of their country to register to defend it," no reason to give them aid); *id* at H4765 (Rep. Hartnett) (same).

**10.** Although the plaintiffs contend, and the district court found, that the Secretary's assertion of administrative necessity was unsupported in the record, the Secretary did in fact discuss the administrative problems involved in implementing the Amendment:

> A practical problem in implementing the Statement of Registration Compliance requirement is the difficulty in identifying which students are required to be registered, especially since some institutions may not have a record of the student's gender or date of birth. Therefore, to minimize the burden on the institution of determining whether a student is required to be registered or is exempt from registration for any of a number of reasons, the Secretary is requiring all title IV aid recipients to complete and submit to the institution the Statement of Registration and Compliance....

48 Fed.Reg. 15,578 (Apr. 11, 1983).

*Comments*: Several commenters suggested that only males should be required to sign the required Statement of Registration Compliance. Further, some of them asked if a waiver might not be granted for schools which enroll female students exclusively.

*Response*: No change has been made. Often, it is not clear from a student's name whether the student is female. Moreover, since students are often paid by credit adjustments to their accounts, there may be no easy way—other than the student's signed statement that she is female—to assure that registration was not applicable. Further, the signing of the Statement of Educational Purpose (which is now part of the combined "Statement of Educational Purpose/Registration Compliance["]) must be done by female as well as male students.... [T]he Secretary [thus] does not feel that a waiver is necessary, even for schools which only enroll female students.

*Id.* at 15,580. *See also* note 12, *infra* (discussing the Secretary's interaction with Congress regarding the implementation of the Amendment).

**11.** The aid cutoff in the Solomon Amendment was not itself designed as a sanction or punishment. *See Selective Service System*, —— U.S. at ——, 104 S.Ct. at 3357. It adds a new condition for Title IV eligibility in an effort to induce

aid for other than their voluntary act. In denying plaintiffs benefits, the Secretary is simply saying that if an individual is unwilling to tell the government that he or she fulfills the conditions for aid, the government will not dispense it. The situation is indistinguishable from many other programs where, before one obtains benefits, one has to fill out a form indicating that statutory conditions have been met. To call such an arrangement a "sanction" or "punishment" is to play with words.

The district court erred not only in viewing DOE's conditioning of aid upon certification of eligibility as a "sanction," but also in finding the "sanction" to be "disproportionately harsh." If the Secretary is not permitted to withhold program benefits from those who voluntarily choose not to complete applications showing their eligibility, he may face serious administrative difficulties. While some types of information may be otherwise accessible, other types may not be—such as information relating to registration eligibility exemptions like being in the armed forces on duty, or being a permanent resident of the Trust Territory of the Pacific Islands or the Northern Mariana Islands. In a program of this magnitude, we are unable to agree with plaintiffs that considerations of "administrative convenience" are insubstantial.

To be sure, it might have been possible to draft the regulations so as to avoid the present confrontation—for example, by accepting a university's certification of age or sex from its other records. *See* note 4, *supra*. But in determining whether regulations conform to a statute, the question is not whether they could have been written more accommodatingly, but whether they are reasonably related to carrying out the statutory purpose. It would be both a

departure from existing law and an unwisely burdensome precedent to hold that perfectly reasonable regulations that condition the granting of aid upon a simple, straightforward showing of eligibility are illegally "harsh" because they might have been drafted so as to have circumvented objections such as the present ones.

In sum, we conclude that the regulations are amply related to the purposes of the Amendment inasmuch as they facilitate, in a reasonable manner, its effective implementation. Beyond administrative ends, moreover, the regulations further the substantive ends of the Solomon Amendment. The principal purpose of the Amendment was to induce eligible individuals to register. *See Selective Service System,* —— U.S. at —— & n. 12, 104 S.Ct. at 3357 & n. 12; note 9, *supra*. The debate included a number of references to the many young men who failed to register because they were unaware of their obligation, and the hope that the Amendment would have the salutary effect of bringing the uninformed into compliance with the law. *See, e.g.,* 128 Cong.Rec. H4757 (daily ed. July 28, 1982) (Rep. Solomon); *id.* at H4759 (Rep. Simon). By requiring all aid applicants to check off on a form the exemption applicable to themselves, the Secretary reminds them of any registration obligations as yet unmet, thus increasing the likelihood of compliance.

In short, under the ordinary understanding of the "reasonably related" standard, "[t]here can be no question ... that these regulations are 'reasonably related to [the purposes of] the enabling legislation.'" *Dickinson v. Bell,* 580 F.Supp. 432, 434 (D.D.C.1984) (quoting *Mourning,* 411 U.S. at 369, 93 S.Ct. at 1661).[12] This being so, the regulations can only be

---

registration-eligible persons to fulfill their obligations and to distribute Title IV funds in a fair manner. *Id.* See also page 637, *supra.*

**12.** Judge Gesell of the United States District Court for the District of Columbia founded his decision upholding the regulations on this basis:

Despite plaintiffs' protestations to the contrary, the regulations at issue were clearly authorized by the relevant enabling legisla-

tion. The Secretary was directed to promulgate regulations to carry out the purposes of the Defense Act. 50 U.S.C. app. § 462(f)(4). The regulations were developed following full notice and comment, and at least some of the concerns raised by the plaintiffs were specifically addressed by the Secretary.

. . . .

The model form set out in the regulations seeks to elicit only such information as is

deemed unauthorized if the congressional debate gave evidence that Congress would regard this means of implementing the statute as unreasonable, or if other considerations point to the necessity of a particularly close fit between the regulations and the Solomon Amendment. Plaintiffs contend that both types of factors exist and that, as a result, the regulations must be closely scrutinized and, ultimately, invalidated as beyond the grant of the enabling legislation. We will address these arguments in turn.

A. First, plaintiffs assert that because Congress was sensitive to the constitution-

al ramifications of the Amendment and because it places a high priority on the Title IV program, Congress purposely made the language of the statute narrow, evidencing its intent to deny aid only to those persons it specifically sought to exclude from Title IV eligibility. We find little or nothing in the congressional debate to support this view; rather the history tends to support the Secretary's regulations.

Congress adopted the present language of section 462(f)(1), (2) because that was the language proposed and approved by the Secretary,[13] not because of any sensitivity to constitutional or other concerns. Such

---

necessary to determine that a student is not disqualified under the Act from receiving federal financial aid. There can be no question, therefore, that these regulations are "reasonably related to the enabling legislation." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369 [93 S.Ct. 1652, 1661, 36 L.Ed.2d 318] (1973). It is also apparent that the regulations are neither arbitrary nor capricious. They have a rational basis, the Secretary considered relevant factors before issuing the regulations, and it cannot be said that the Secretary clearly erred in determining that the regulations promulgated were the appropriate means of carrying out the purposes of the Act. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 [91 S.Ct. 814, 823, 28 L.Ed.2d 136] (1971). The Court therefore concludes that the Secretary did not exceed his authority in promulgating the regulations at issue.
*Dickinson v. Bell,* 580 F.Supp. 432 at 434 (D.D.C. 1984).

**13.** The amendment originally offered by Rep. Solomon provided that the Director of the Selective Service System would submit to the Secretary of Education, with respect to each applicant for Title IV aid, verification of whether the individual had violated the registration laws. On the basis of this verification, the Secretary would make a preliminary determination of whether each applicant had complied with the registration laws. If he determined that the applicant had not complied, the Secretary would notify the applicant, who could, within the next 30 days, submit any information with respect to his compliance with, or violation of, the registration laws. The Secretary then would make a final determination of the applicant's registration status, and would deny aid to those who were required to register but had failed to do so.
A number of Congressmen objected to this procedure as unworkable. *See, e.g.,* 128 Cong. Rec. H4758, H4763 (daily ed. July 28, 1982)

(Rep. Simon); *id.* at H4759–60 (Rep. Edgar); *id.* at H4760 (Rep. Patterson); *id.* at H4765 (Rep. Peyser). They quoted the Office of the General Counsel for the Department of Education, which had expressed reservations about DOE's ability to compile a list of applicants to give to the Director of the Selective Service System for verification, and to process all information in the time required:
The second problem inherent in this amendment is the expense and administrative burden involved in its implementation. The Office of the General Council for Education Department has stated that to implement the proposals of this amendment—
["]Some sort of elaborate tape system would be required. The Education Department does not now have tapes of Title IV recipients, and it is doubtful that they could be produced—certainly not on a timely basis.["]
There are currently no funds available for such a system, or for the personnel needed to set one up.
This amendment is also simply unworkable. Secretary of Education Bell, in a letter to OMB Director David Stockman concerning this amendment, maintains that—
["]The regulatory and enforcement role that would be created by this provision for the Education Department is far beyond any of our current activities and would impose considerable burdens on institutions of higher learning and members of the public. We are deeply concerned that the burdens imposed would far outweigh the benefits gained.["]
The Secretary adds that—
["]The means proposed * * * would require a level of unnecessary Federal intrusion and administrative complexity and burden which we roundly oppose.["]
128 Cong.Rec. H4760 (daily ed. July 28, 1982) (Rep. Edgar).
Rep. Hartnett then offered an amendment to the Solomon Amendment that contained the language now codified as section 462(f)(2) (re-

concern as existed over the Amendment's constitutionality sprang from the alleged discriminatory effect the Amendment would have on low- to middle-income students and from possible due process problems with the procedural protections af-

forded applicants.[14] Sensitivity to possible first amendment problems was never mentioned, even when the debate centered on a proposed exemption from aid denial for non-registrants who certified that they were eligible for registration but refused to register on moral or religious grounds.[15]

quiring statement of compliance from those persons required to register'). Rep. Solomon noted

> If I had had the opportunity today, I would be offering not [my] amendment but the substitute amendment that the gentleman from South Carolina (Mr. HARTNETT) is offering, because it is the amendment that was given to us today by Secretary Bell with his full approval, with the full approval of the Selective Service Administration, and with the full approval of the Office of OMB and the Reagan administration.
>
> Let me read to the Members from this letter, which is dated yesterday afternoon:
>
> ["]On behalf of the Secretary, I would like to clarify a recent misrepresentation in the press of the Secretary's position on receipt of student financial assistance and compliance with certain requirements under Federal law.["]
>
> Then later they go on to say:
>
> ["]To achieve that goal, the Department has recommended a substitute amendment to change the requirements for student eligibility under title IV by requiring students to certify compliance with section 3 prior to receiving such assistance.["]
>
> Now what we are doing is removing all of the objections that were there before on the [Solomon] amendment. We have corrected it.

*Id.* at H4764 (Rep. Solomon).

The bottom line appears to be that when confronted with the argument that the proposed method of implementing the Amendment was found by DOE to be beyond its capabilities, the members simply deferred to the method (and language) devised by the Secretary. *See id.* at H4766 (Rep. Solomon) ("The Secretary's letter went on to state exactly the wording in the Hartnett substitute, identical. There has not been one change made. We have taken the language that the Secretary of Education has recommended, put it in the amendment, and that is what we are voting on here today.")

Thus, in considering the intended effect of the language of the statute, we should give great deference to the Secretary's views, as embodied in his implementing regulations. *See, e.g., Selective Service System,* —— U.S. at ——, 104 S.Ct. at 3354 ("Nor did [the district court's] construction of [the Solomon Amendment] give adequate deference to the views of the Secretary of Education, who had helped to draft the statute.").

**14.** Various members expressed concern over "the critical issue of discrimination." 128 Cong.

Rec. H4761 (daily ed. July 28, 1982) (Rep. Goldwater). They argued that:

> the Solomon amendment is blatantly discriminatory. Only low-income and middle-income students will be caught in this trap. If a student comes from a wealthy background, is capable of financing his education privately, the amendment does not punish him. However, if a student is poor or from a middle-income background, the full force of the Solomon amendment is applied.

*Id.* at H4758 (Rep. Moffett). The issue was discussed extensively. *See, e.g., id.* at H4764, H4766 (Rep. Hartnett); *id.* at H4765, H4767 (Rep. Dellums); *id.* at H4767 (Rep. Solomon). Aside from a reference to due process concerns over procedural protections afforded applicants, *see id.* at H4760 (Rep. Edgar), this is the only area in which, as the district court stated, Congress could be said to have given "full consider[ation] to the constitutional implications of its own narrowly defined action." It has little relevance to the issue we now face.

**15.** Rep. Simon proposed an amendment that would have provided that students could qualify for Title IV funds even though they were required to register but had not done so if they stated that they had a religious or moral objection to registration. Although this proposal has first amendment overtones, it is established that conscientious objection to military service is not a right founded in the first amendment, but rather is a legislatively created exception to service requirements. *See Gillette v. United States,* 401 U.S. 437, 461–62, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971); *Welsh v. United States,* 398 U.S. 333, 356, 90 S.Ct. 1792, 1804, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring); *Hamilton v. Regents,* 293 U.S. 245, 263–65, 55 S.Ct. 197, 204–205, 79 L.Ed. 343 (1934). Thus, in debating the wisdom of the provision, the members were concerned with its fairness, its administrative practicality, and its necessity, not with its constitutional ramifications.

In the end, Congress apparently concluded that the availability of conscientious objector status in the classification process satisfied all felt needs for an exception for persons with religious or moral objections to military service. Illustrative are the following observations:

> To my knowledge, I do not think there has ever been in this country a religious opposition to registering for the draft or registering for social security or registering for anything else.

Nor are the policies underlying Title IV such as would require that we construe strictly the language of the Amendment. As we have earlier said, *see* note 11, *supra; compare* page 637, *supra,* the Solomon Amendment was not viewed in Congress as a measure in which Title IV was used to achieve punitive ends unrelated to the Title IV program. Representative Solomon introduced the Amendment to add a condition for eligibility for Title IV funds, *see* 128 Cong.Rec. H4757 (daily ed. July 28, 1982) (Rep. Solomon),[16] not to penalize a specific group of individuals. The debate reflects the members' belief that it would be unfair to allow those who failed to fulfill their minimal registration obligation to have the benefit of the limited Title IV funding. The Amendment is therefore consistent with the policy behind Title IV—to provide financial assistance to those students whom Congress deemed to be needy and deserving. Viewed in this light, the DOE requirement that applicants give the Department the information it needs to determine whether the applicants fulfill the Amendment's eligibility condition does not impede the purposes of Title IV any more than requirements regarding parental financial disclosure do.

. . . .

[I]s it not true that in this country everybody has traditionally registered and only at the time of induction one has applied for conscientious objector status; is that not correct? 128 Cong.Rec. H4760 (daily ed. July 28, 1982) (Rep. Badham).

The individual registers. He is only classified or presents himself for classification as a conscientious objector or whatever when there is a draft in effect, but there is no draft.

We are asking these people to sign their names and submit them, and that is it. I think it is a sad commentary if, all we ask in return for whatever aid or tuition aid or whatever, is just to sign one's name to part of a classification aspect when there is a draft. *Id.* at H4762 (Rep. Mitchell).

And it must be remembered that registration means only that; in the event of a national emergency a classification process would follow. There would be ample opportunity to request deferment, to be classified as a conscientious objector, or to choose a branch of service.

Two other conclusions to be drawn from the legislative history of the Amendment reinforce our belief that Congress, if faced with the issue now before us, would agree that these regulations are reasonable. First, Congress determined that Title IV funds could be denied to those whose failure to register was prompted by religious or moral reasons. By extension, it seems unlikely Congress would have particular sympathy for those registration-exempt persons who, for like reasons, refuse to take the far less burdensome step of noting their exemption on a statement of compliance.

Second, the legislative history reveals that the present statutory method of implementing the exclusion of non-exempt, unregistered students from the Title IV program (*i.e.,* mandating that each person required to register certify as to compliance, as opposed to requiring DOE and the Selective Service System to cross-check lists of applicants and registrants, as originally proposed) turned on DOE's estimate of the administrative workability of the proposals.[17] It appears that Congress adopted the present system because the Secretary considered it more feasible, leading us to infer that Congress would likewise go

129 Cong.Rec. S4944 (daily ed. May 12, 1982) (Sen. Hayakawa).

**16.** Mr. SOLOMON. Mr. Chairman, this amendment prohibits young men who are in violation of the Draft Registration Act from receiving any financial assistance under title IV of the Higher Education Act.

The amendment which establishes an additional condition of eligibility for student financial assistance should more properly be a part of the law governing the relevant program, which is the Higher Education Assistance Act; however, because there is an immediate need for this legislation now—that means today—and because there will be no opportunity this year to amend the Higher Education Assistance Act, which is not due for reauthorization until next year, I felt that it was imperative, as did the other body, to offer this amendment to the defense authorization bill.
128 Cong.Rec. H4757 (daily ed. July 28, 1982) (Rep. Solomon).

**17.** *See* note 13, *supra.*

along with the Secretary's related, if broader, regulatory scheme.

The foregoing analysis of the congressional debate over the Solomon Amendment leads us to conclude that a literal and restrictive construction of the statutory language is not called for, and that Congress would think that the current regulations are "reasonably related" to the Amendment.

B. Plaintiffs next argue that because this case raises a substantial constitutional issue (*i.e.*, whether the regulatory requirement that registration-exempt individuals submit a statement of compliance as a precondition to obtaining Title IV aid impermissibly burdens their free exercise rights), this court should construe the regulations' enabling legislation narrowly so as to avoid that question. *See St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979); *Kent v. Dulles*, 357 U.S. 116, 129, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958). They contend that if such a reading is applied, the Secretary's regulations will be invalidated as exceeding the authority conferred by the statute.

Their canon of construction, which holds that an act of Congress ought not to be construed to violate the Constitution if any other possible construction remains available, *see Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804); *Catholic Bishop*, 440 U.S. at 500, 99 S.Ct. at 1318, is not applicable here. Plaintiffs' constitutional argument falls far short of provoking the "serious doubt of the [regulations'] constitutionality" necessary to invoke this canon of construction. *Machinists v. Street*, 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961). *See also Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319.

The denial of Title IV aid to those who refuse, out of religious scruples, to meet DOE regulatory conditions for granting aid, arguably may constitute some slight burden on the plaintiffs' first amendment rights. *See Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404–05, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). Plaintiffs contend, therefore, that to sustain the constitutionality of the regulations, a court must find that such incidental burdening of the plaintiffs' first amendment rights "is essential to accomplish an overriding governmental interest." *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). *See also Wisconsin v. Yoder*, 406 U.S. 205, 214–15, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972); *Sherbert*, 374 U.S. at 403, 83 S.Ct. at 1793. The "burden" here on free exercise rights is, however, at best remote and tangential. We believe the above strict standard is inappropriate where only such a remote intrusion on an individual's free exercise rights has been shown. *See United States v. Boardman*, 419 F.2d 110 (1st Cir.), *cert. denied*, 397 U.S. 991, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970) (fact that defendant's conduct in failing to report for civilian work in compliance with a selective service board order was based on religious belief did not preclude criminal conviction). As this court explained in *Boardman*:

> The Constitution does not extend the same degree of protection to every manifestation of religious impulse. The strict standard which defendant invokes may be appropriate when the government seeks to regulate acts of worship, or to compel conduct which violates a cardinal tenet of religious faith. In this case, however, defendant has been ordered to work in a hospital, an employment in which he has already engaged without violence to his principles. Defendant objects not to the specific conduct which the government requires, but to cooperation with a system which he considers wicked. But, in the words of Mr. Justice Cardozo,
>
> "Never in our history has the notion been accepted * * * that acts thus indi-

rectly related to service in the camp or field are so tied to the practice of religion as to be exempt, in law or in morals, from regulation by the state. * * * [A] different doctrine would carry us to lengths that have never yet been dreamed of. The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government." *Hamilton v. Board of Regents*, 293 U.S. 245, 267, 268, 55 S.Ct. 197, 206, 79 L.Ed. 343 (1934) (concurring).

*Id.* at 112–13 (footnotes omitted).

Just as in *Boardman*, plaintiffs here object on religious grounds "not to the conduct which the government seeks to compel[, *i.e.*, to the giving of information about one's sex or age, per se], but to the national policy which that conduct promotes[, *i.e.*, the Selective Service System's functioning]." *Id.* at 112. Plaintiffs have, in fact, provided similar information, *i.e.*, sex or age, on documents submitted to Boston University in other connections. This is not a case where the government seeks to extract information which, by itself, directly violates a religious tenet. *Compare Quaring v. Peterson*, 728 F.2d 1121 (8th Cir.1984) (requiring state to make exception to state drivers licensing requirement that applicants submit a photograph to accommodate applicant's free exercise of religious belief that taking of her photograph directly violates the second commandment's express prohibition on the making of any graven image), *aff'd by equally divided Court*, Westlaw, Supreme Court Database (June 17, 1985).

To be sure, it may not always be easy to draw lines in the first amendment area between objections to the conduct compelled and objections to the policy promoted by that conduct. Speech and religion arguments often involve highly symbolic objections. But in this case, the burden on plaintiffs' free exercise is at least as attenuated as the burdening upheld in *Boardman*. The challenged practice does not, therefore, deserve the same degree of scrutiny warranted where more direct infringements of religious freedoms are involved. *See also Johnson v. Robison*, 415 U.S. 361, 385–86, 94 S.Ct. 1160, 1174–75, 39 L.Ed.2d 389 (1974) (holding that free exercise right of appellee, a conscientious objector exempted from military service, was not violated by denial of educational benefits under the Veteran's Readjustment Benefits Act of 1966, stating that "[t]he withholding of educational benefits involves only an incidental burden upon appellee's free exercise of religion—if, indeed, any burden exists at all.").

Balancing whatever slight burden is borne by plaintiffs in being required to state that they are registration-exempt because of their sex or age against the governmental interest in securing this or like information from students seeking aid, we believe the governmental interest prevails. The Court, to be sure, has rejected questionable assertions of administrative convenience as justifying certain more substantial infringements of individuals' free exercise rights. *See, e.g., Thomas*, 450 U.S. at 719, 101 S.Ct. at 1432; *Sherbert*, 374 U.S. at 407, 83 S.Ct. at 1795. One—although not the only—governmental interest in the enforcement of this regulation without exceptions, *see United States v. Lee*, 455 U.S. at 259, 102 S.Ct. at 1056; *Quaring*, 728 F.2d at 1126, doubtless stems from administrative convenience. But in none of the cases where free exercise rights have overridden administrative convenience have the free exercise rights been so remote as a mere claim of right to withhold routine personal data which, by itself, has no religious significance to plaintiffs and is being withheld solely because elicited to show exemption from a program plaintiffs abhor. If administrative convenience must give way on this occasion, we would fear the erosion of the government's essential right to obtain from its citizens, without endless

litigation and hassle, the basic information needed to govern.

Moreover, it is not administrative convenience alone that is involved here. Also implicated is the government's power to raise and support an army. U.S. Const., Art. I, § 8. A chief purpose of the Solomon Amendment was to induce eligible individuals to register, and the regulations here at issue, as explained at pages 637–639, *supra*, both implement that inducement and serve an educational function regarding students' registration responsibilities. The courts have given the federal government's authority under section 8 of Article I great weight in cases dealing with conscientious objectors to military registration,[18] the draft,[19] and alternative service requirements,[20] and in other cases.[21] We think that any remote and indirect burden on plaintiffs' first amendment rights is far outdistanced by the immediate and direct governmental interest here involved.

In sum, we believe that plaintiffs' constitutional challenge is not sufficiently "serious" to warrant the very restrictive reading of the statutory language for which plaintiffs argue. We conclude that the reg-

ulations were authorized by the Solomon Amendment, and accordingly reverse the judgment below enjoining defendants from denying aid to plaintiffs.

In view of our reversal of the district court's judgment, we do not reach plaintiffs' cross-appeal concerning class relief and the scope of injunctive relief.

Because the court below believed that the contested regulations were not statutorily authorized, it did not reach plaintiffs' federal free exercise claim nor did it reach plaintiffs' state law claims. This court, however, has rejected plaintiffs' federal free exercise claim in the course of rejecting plaintiffs' argument that the enabling legislation should be read narrowly, and the challenged regulations should thereby be held to exceed statutory authority, because the regulations give rise to serious federal constitutional doubts. The district court should, on remand, determine whether there remain any issues that are still appropriate for it to determine after our opinion, and, if any, make such disposition of them as it considers proper.[22]

*Reversed and remanded.*

---

**18.** *See, e.g., United States v. Bertram,* 477 F.2d 1329, 1330 & n. 2 (10th Cir.1973); *United States v. Reiss,* 478 F.2d 338, 339 (2d Cir.1973); *United States v. Koehn,* 457 F.2d 1332, 1334–35 (10th Cir.1972); *United States v. Bigman,* 429 F.2d 13, 15 (9th Cir.), *cert. denied,* 400 U.S. 910, 91 S.Ct. 141, 27 L.Ed.2d 150 (1970); *United States v. Palmer,* 223 F.2d 893, 895–97 (3d Cir.) (en banc), *cert. denied,* 350 U.S. 873, 76 S.Ct. 116, 100 L.Ed. 772 (1955); *United States v. Henderson,* 180 F.2d 711, 713–15 (7th Cir.), *cert. denied,* 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372 (1950); *Gara v. United States,* 178 F.2d 38, 40 (6th Cir. 1949).

**19.** *See, e.g., Hamilton v. Regents,* 293 U.S. 245, 264, 55 S.Ct. 197, 205, 79 L.Ed. 343 (1934); *United States v. Macintosh,* 283 U.S. 605, 623–24, 51 S.Ct. 570, 574–75, 75 L.Ed. 1302 (1931). *Cf. In re Summers,* 325 U.S. 561, 572–73, 65 S.Ct. 1307, 1313–14, 89 L.Ed. 1795 (1945); *Gillette v. United States,* 401 U.S. 437, 461 n. 23, 91 S.Ct. 828, 842 n. 23, 28 L.Ed.2d 168 (1971).

**20.** *See, e.g., United States v. Milligan,* 457 F.2d 916 (8th Cir.1972) (per curiam); *United States v. Boardman,* 419 F.2d 110 (1st Cir.1969), *cert. denied,* 397 U.S. 991, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970).

**21.** *See, e.g., Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

**22.** We disagree with the position of our dissenting colleague, Judge Breyer, that this case can properly be disposed of on grounds of "substantial compliance." Plaintiffs have never claimed substantial compliance; that issue was not presented below nor was it raised on appeal. To the contrary, plaintiffs have vigorously sought to have a class certified and to litigate the general question of the right of all persons similarly situated to decline on statutory and constitutional grounds to furnish, in the called-for manner and context, the information required by the regulations. In the present posture of the case, for us to decide on the novel ground Judge Breyer suggests would be contrary to the understanding of both the district court and all the parties as to the issues in the case. We decline to take that route. Plaintiffs are entitled to have the merits of their position confronted and examined, and the government is similarly entitled to a meaningful precedent for future instances of non-compliance.

BREYER, Circuit Judge (dissenting).

The appellees would like the court to hold that the government must pay them educational benefits despite their reluctance (for religious reasons) to fill out the proper form. The government, on the other hand, wishes to show that it can insist upon punctilious adherence to its formal requirements. This court, however, need not—indeed it should not—resolve the clash of 'bureaucratic v. religious' principles for one simple reason. The applicants in effect *have* filled out the critical parts of requisite forms; they have directly provided the government with all the information it requested; they have made the necessary certifications; their deviation from the formal requirements is insubstantial or de minimis. For this reason, irrespective of the validity of the claim of 'religious right,' the government should pay the students the educational benefits to which they are entitled.

The regulation in question says that a university may provide a student with Title IV federal financial aid only if the student "files a Statement of Registration Compliance with the institution." The regulation adds:

In the Statement of Registration Compliance, the student must certify either that he or she is registered with Selective Service or that, for a specified reason, he or she is not required to be registered.

34 C.F.R. § 668.24(a) (1984). The Secretary of Education has provided a "model statement" form of a registration compliance statement, *see id.* § 668.25, but the regulation does not require the university to use this particular form. Indeed, in a supplementary communication to colleges and universities, the Department said

a verbatim repetition of the model statement in the regulations would not be required as long as all substantive requirements of the regulations are included in the institution's statement.

The Department has also made clear that statements are to be filed with universities. And, the universities are to keep the statements; they are *not* to forward them to the Department.

Each student in this case has sent directly or indirectly to the university's financial aid office four or five sheets of paper which, in an obvious, readily available way, contain all the necessary information and certifications. To understand how this occurred, one must focus upon two separate documents both of which a financial aid applicant arranges to have sent to the university. The first document is entitled "Financial Assistance Statement." The Financial Assistance Statement contains a set of boxes apparently used to calculate the amount of an aid award. At the bottom of the page there is a "Statement of Educational Purpose/Registration Requirement" which reads as follows:

I certify that I will use the money I receive under the Title IV student financial aid programs only for expenses related to attendance at Boston University, and (check one):

\_\_\_\_ I certify that I am not required to be registered with Selective Service because—(check one reason):

> \_\_\_\_ I am a female.
> \_\_\_\_ I am in the armed services on active duty. (Note: Members of the Reserves and National Guard are not considered on active duty.)
> \_\_\_\_ I have not reached my 18th birthday.
> \_\_\_\_ I was born before 1960.
> \_\_\_\_ I am a permanent resident of the Trust Territory of the Pacific Islands or the Northern Mariana Islands.

\_\_\_\_ I certify that I am registered with Selective Service.

By my signature I also acknowledge that I have read and agree to the statements on both sides of this document.

Signature: _____ Date: _____

NOTICE: You will not receive Title IV financial aid unless you complete this statement and, if required, give proof to your school of your registration compliance. If you purposely state falsely that you are registered or that you are not required to be registered, you may be subject to fine or imprisonment, or both.

---

The second document consists of several pages entitled "Financial Aid Form." Side I of this form asks the student to list, among other things, his or her name and "date of birth." Side II asks for other information, including "Student's sex (optional) _____ Male _____ Female." The form contains a space for the student's signature, next to the statement:

**Certification:** All of the information on this form is true and complete to the best of my knowledge. If asked by an authorized official, I agree to give proof of the information I have given on this form....

At the top of Side I, in a box outlined in dark print, there appears the following notice:

**Warning**

If you use this form to establish eligibility for federal student aid funds, you should know that any person who makes false statements or misrepresentations on this form is subject to a $10,000 fine or to imprisonment or both, under provisions of the United States Criminal Code.

Two of the student appellees in this case refused to fill out the first form, though one of them sent it in signed, with the boxes unchecked. The third student, Michael Alexander, properly filled out a statement of registration compliance (which consisted of the relevant portion of the Statement). He has added that he did so "under duress." Each of the three students filled out the Financial Aid Form and indicated on that form his or her sex and date of birth. Each signed the form's certification. To be more specific, the two female applicants did *not* put a check next to the two lines in the Statement that say

____ I certify that I am not required to be registered with Selective Service because . . .

____ I am a female.

---

But each of them *did* check the box on the Financial Aid Form that said "Female," and each signed a "certification" that this representation was true. The male applicant, Michael Alexander, in fact signed a statement of registration compliance and put a check next to the two lines that say

____ I certify that I am not required to be registered with the Selective Service because . . .

____ I was born before 1960.

---

He says now that he did so "under duress." He also filled in, without objection, a blank in the Financial Aid Form with his birthdate, and signed a "certification" that this representation was true.

The few pages of the Financial Aid Form provide the university with all the information, certifications, and signatures the regulation calls for. The information is simple and straightforward; its relevance to the

statute is obvious. Anyone inspecting the few pages briefly would know at a glance that the applicant does not have to register for the draft. The information is readily available. Apparently, the student sends the forms (or copies of the forms are sent), directly or indirectly, to the University's financial aid office, where they would seem likely to end up in the same file as the official "Statement." As previously mentioned, the government says specifically that the university is *not* to send it the compliance forms; the university is to keep them itself.

I agree that the students have not checked the proper box on the proper form. As a general matter, the government has a strong administrative interest in insisting that applicants fill out forms properly. But, are there not stronger reasons for the government simply to overlook so trifling a deviation from the bureaucratic norm, at least where the applicants have a genuine religious or ideological scruple that prohibits their supplying the information on one form but not on another, equally useful one? To deny this, in a nation as diverse as ours, housing so many strongly held but differing points of view, is to exacerbate conflict where it could be muted. It is also to threaten an unnecessary weakening of judicial authority insofar as that authority rests on judicial reluctance to intervene in ideological disputes unless and until they focus upon differences over matters of substance. *Cf. Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

That the case before us is one of 'trivial deviation' I have no doubt. What bureaucratic or other governmental purpose is served here by the government's refusal to tolerate the deviation at issue, by its insistence upon literal compliance with a 'check-the-box' rule (a rule apparently derived by interpretation of a set of 'questions and answers' interpreting a regulation interpreting the statute, *see* majority opinion, *ante*, pp. 633–634)?

1. Will the government's insistence provide the government or the university with additional useful information?

No. The Financial Aid Form gives the government and the university the same information.

2. Will it help to clarify, or specify, the information?

No. The information—sex and age— could not be more clear; it is provided on the Financial Aid Form in a manner that allows no confusion.

3. Will it help a 'verifying official' by making clear the relevance of the information to the statutory need?

No. The relevance to the statute is obvious—i.e., it is obvious that women and older students do not have to register for the draft.

4. Will it make it easier for the government later to penalize or to prosecute those who lie?

No. The certification appears on both forms; the signature appears on both forms; the warnings of penalties and prosecution appear on both forms (and the warning on the Financial Aid Form is stronger).

5. Will it make it easier for the government to locate the information?

Not really. Neither the Financial Assistance Statement nor the Financial Aid Form is sent to the government. Both of them (or copies of them) apparently live out their full lives together in the files of Boston University's financial aid office.

Under these circumstances, common sense suggests that the Department should have concluded that the students' failure to check the right box presents no threat to the Republic, to the statute, to the regulation, or to orderly administration. The Department had adequate legal power to treat the deviation as de minimis, to find that the students had substantially complied with statute and regulation. *See Alabama Power Co. v. Costle,* 636 F.2d 323, 360 & n. 88 (D.C.Cir.1979) (stating that agencies have power to overlook de minimis deviations from regulations and listing cases);

*cf. American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 537–38, 90 S.Ct. 1288, 1291–92, 25 L.Ed.2d 547 (1970) (ICC may relax procedural rules requiring certain information to be set forth in statements in a given case when justice requires); *NLRB v. Ideal Laundry and Dry Cleaning Co.,* 330 F.2d 712, 718 (10th Cir. 1964); *McKenna v. Seaton,* 259 F.2d 780, 783–84 (D.C.Cir.), *cert. denied,* 358 U.S. 835, 79 S.Ct. 57, 3 L.Ed.2d 71 (1958).

Where the agency's interest in form is negligible, it might well be unreasonable or "arbitrary" for it to refuse to find that an applicant substantially complied with its rules or to make an exception. Could the Department, for example, recover funds from an applicant who had *accidently* forgotten to check the right box several years earlier? *Cf. NLRB v. Marshall Maintenance Corp.,* 320 F.2d 641, 643–45 (3d Cir. 1963) (overturning Board's "inflexible adherence to the strict letter of the law," in case of one-day delay in filing of exceptions) and authorities cited there; *NLRB v. Central Mercedita, Inc.,* 273 F.2d 370, 372 (1st Cir.1959) (Board acted arbitrarily in defaulting party whose exceptions were two days late). *See generally Alabama Power Co. v. Costle,* 636 F.2d at 360 n. 87 (listing de minimis cases); *Sawyer v. County of Sonoma,* 719 F.2d 1001, 1008 (9th Cir.1983) ("The doctrine of substantial compliance is an equitable doctrine designed to avoid hardship in cases where the party does all that can reasonably be expected of him."); *Videotronics, Inc. v. Bend Electronics,* 586 F.Supp. 478, 484 (D.Nev.1984) ("[I]n determining whether there has been substantial compliance with a statute, a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which it was adopted.")

In any event, given the lack of agency interest in insisting upon literal compliance with its interpretation of its rule and given the constitutionally protected interests that the applicants assert, the agency's insistence here, in my view, is unreasonable. The agency's interest is no weightier than a state's in enforcing various procedural technicalities that the courts have found inadequate to withstand the assertion of a constitutional right. *Compare Shuttlesworth v. City of Birmingham,* 376 U.S. 339, 84 S.Ct. 795, 11 L.Ed.2d 766 (1964) (a minor procedural failing, such as using the wrong type of paper, cannot constitute an 'adequate state ground' blocking review of a federal constitutional issue); *Wright v. Georgia,* 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963) (same); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, *The Federal Courts and the Federal System* 545 (2d ed. 1973). Under these circumstances, the agency should simply make an exception to what is basically an informal interpretation of its regulation. *See Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (requiring that state make minimal adjustment to accommodate religious principle); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (same); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (same); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (same). *Cf. Asimakopoulos v. Immigration and Naturalization Service,* 445 F.2d 1362 (9th Cir.1971) (requiring individualized exercise of agency discretion in light of statutory policy). The agency's failure to make so minimal an accommodation as is required here is, in my view, "arbitrary." 5 U.S.C. § 706(2)(A).

The other members of the panel are unwilling to view this appeal as presenting an issue of "substantial compliance" because the parties did not argue it on that basis. Majority opinion, *ante,* n. 22. The students' brief in the district court, however, comes close to doing so. ("The only relevant inquiry is whether the defendants *already* have information concerning *these* plaintiffs that they could rely upon in lieu of requiring submittal of the Statement." App. at 153; emphasis is in original.) And, we discussed the matter with counsel at oral argument. *See* majority opinion, *ante,* n. 4. *See also Doe v. Anrig,* 728 F.2d 30, 32 (1st Cir.1984) ("We are, of course, free

to affirm a district court's decision 'on any ground supported by the record even if the issue was not pleaded, tried, or otherwise referred to in the proceedings below.' "). In any event, I would not allow the parties, through their choice of arguments, to force this court unnecessarily to decide a broader constitutional question than the facts require. If necessary, we should call for reargument or remand the case to the district court for further consideration of the point. *Cf. Massachusetts v. Westcott,* 431 U.S. 322, 97 S.Ct. 1755, 52 L.Ed.2d 349 (1976) (per curiam). In the absence of any such further reconsideration, and particularly in light of the First Amendment considerations raised, I would find that the appellees have substantially complied with the agency's rules and therefore require the government to grant them the financial assistance they seek.

Breyer, J., concurred and filed opinion.