# United States Court of Appeals
## For the First Circuit

No. 20-1537

BAIS YAAKOV OF SPRING VALLEY,
on behalf of itself and all others similarly situated,

Plaintiff, Appellant,

v.

ACT, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Aytan Y. Bellin, with whom Bellin & Associates LLC was on
brief, for appellant.
Robert A. Burgoyne, with whom Perkins Coie LLP, Robert L.
Leonard, and Doherty, Wallace, Pillsbury & Murphy, P.C., were on
brief, for appellee.

August 30, 2021

**KAYATTA**, <u>Circuit Judge</u>.  ACT, Inc., is a non-profit entity that develops and administers the ACT college admissions test.  Bais Yaakov of Spring Valley is a small private high school to which ACT sent three one-page faxes in 2012.  Bais Yaakov has since pursued ACT with a zeal that would impress even Hugo's Inspector Javert.  On behalf of itself and a class of similarly situated recipients of faxes from ACT, Bais Yaakov alleges that the faxes were unsolicited advertisements sent in violation of the Telephone Consumer Protection Act of 1991 (TCPA), 47 U.S.C. § 227(b)(1)(C).  Bais Yaakov seeks injunctive relief and statutory damages in an amount ACT estimates to exceed $400,000,000.

After almost eight years of litigation -- including an interlocutory appeal to this court, <u>see</u> <u>Bais Yaakov of Spring Valley</u> v. <u>ACT, Inc.</u>, 798 F.3d 46, 46 (1st Cir. 2015) -- the district court entered judgment against Bais Yaakov.  It found that class certification was unwarranted and that Bais Yaakov's individual claim was rendered moot by ACT's offer to pay the full amount of that claim ($46,500) and its promise not to send further faxes to Bais Yaakov.  While we see no abuse of discretion in the denial of class certification, we vacate the judgment because Bais Yaakov's own claim for damages is not quite moot.  Our reasoning follows.

In 2005, Bais Yaakov filled out a High School Code Request Form, on which it provided its fax number. Students use the High School Code number to have their ACT test scores reported to their high school. On the form, Bais Yaakov checked a box indicating that it wanted to administer certain standardized tests, that it wanted to receive its students' test scores, and that it wanted to receive SAT or ACT publications.

Seven years later, ACT sent three faxes to Bais Yaakov over the course of three months. The first fax was a one-page flyer stating in large bold letters, "Don't forget to register for the ACT!" Underneath, the fax directed counseling staff to "[r]emind" students of the next ACT test date, which it featured prominently. It listed the registration deadlines for the test date and advised that "[s]tudents can meet the . . . deadline by registering on-line" at a specified ACT web address. In the top-left corner, the fax presented the name "ACT" above the words "advancing lives."

The second fax was identical to the first but with a different test date and corresponding registration deadlines.

The third fax contained what appears to be an image of a crowd cheering at a baseball game, with the words "Give Your Students the Home-Field Advantage" superimposed on one side and "ACT" on the other. The bottom of the image stated, "Become an

ACT Test Center." Beneath the image was more text, which said, among other things: "By offering the ACT at your high school you provide your students with a competitive edge."; "Your school can benefit too. Your school staff will be compensated for assuming the roles of test supervisor, room supervisors, and proctors."; and "The curriculum-based ACT is accepted by all 4-year colleges and universities in the U.S." (emphasis omitted).

Bais Yaakov alleges that these three faxes are among over 28,000 unlawfully faxed advertisements ACT sent to over 7,000 schools across the country between 2008 and 2012.

## II.

## A.

The TCPA prohibits sending advertisements to fax machines, but with two principal exceptions: An advertisement may be sent to a fax machine (1) if the person to whom it is sent has given "prior express invitation or permission, in writing or otherwise," 47 U.S.C. § 227(a)(5); or (2) if certain conditions are satisfied, one of which requires the inclusion of an opt-out notice on the fax, id. § 227(b)(1)(C). None of the faxes at issue in this appeal contains an opt-out notice, so any that are advertisements are unlawful if they were sent without prior express invitation or permission.

By regulation, the Federal Communications Commission (FCC) promulgated a substantial further limitation on sending

- 4 -

advertisements by fax. In its so-called Opt-Out Regulation (also referred to as the Solicited Fax Rule), the agency decreed that even faxes sent with prior express invitation or permission must contain an opt-out notice. See Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25,967, 25,971-72 (May 3, 2006) (formerly codified at 47 C.F.R. § 64.1200(a)(4)(iv)); Bais Yaakov of Spring Valley v. FCC, 852 F.3d 1078, 1080 (D.C. Cir. 2017) (Kavanaugh, J.). ACT included no opt-out notice in any of its faxes, so if the Opt-Out Regulation is valid, prior express invitation or permission would be no defense. Instead, ACT's liability to any recipient would turn entirely on whether the fax was an advertisement.

The FCC defines the term "advertisement" for purposes of the TCPA as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1); see also 47 U.S.C. § 227(a)(5) (using similar language to define the term "unsolicited advertisement"). To classify a communication as "advertising," the agency looks to the communication's "primary purpose." In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 31 FCC Rcd. 13,289, 13,291 (2016).

**B.**

Bais Yaakov proposed two alternative classes, labeled Class A and Class B. With Class A, Bais Yaakov sought to include only recipients of "unsolicited" fax "advertisements" from ACT containing no opt-out notice. With Class B, Bais Yaakov sought to take advantage of the Opt-Out Regulation by broadening the class to include recipients of any (even solicited) fax advertisements from ACT that did not contain an opt-out notice as required by the regulation.

With the parties' consent, the district court considered first whether the Opt-Out Regulation was valid. In finding the regulation to be invalid, the district court deemed binding a decision to that effect by the Court of Appeals for the D.C. Circuit. See Bais Yaakov of Spring Valley v. ACT, Inc., 328 F.R.D. 6, 10 (D. Mass. 2018) (citing Bais Yaakov, 852 F.3d at 1083).[1]

Having eliminated the Opt-Out Regulation as a tool for establishing that every fax sent by ACT necessarily violated the TCPA because ACT never included opt-out notices, the district court turned its attention to the two issues raised by the TCPA's

---

[1] Following the D.C. Circuit's ruling in Bais Yaakov, the FCC eventually repealed the Opt-Out Regulation. See In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991 Junk Fax Prevention Act of 2005 Petitions for Reconsideration &/or Declaratory Ruling & Retroactive Waiver of 47 C.F.R. § 64.1200(a)(4)(iv) Regarding the Commission's Opt-Out Notice Requirement for Faxes Sent with the Recipient's Prior Express Permission, 35 FCC Rcd. 3079 (2020).

exceptions from its prohibition on advertisements: Did the fax contain an advertisement? And, if so, was it unsolicited (i.e., sent without prior express invitation or permission)? As to these two issues, the district court took the standard Rule 23 approach: It did not try to resolve the issues; rather, it properly tried to decide whether Bais Yaakov had shown that resolution of the issues could be accomplished on a common, class-wide basis. See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 459-60 (2013) ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather it is to select the 'metho[d]' best suited to adjudication of the controversy fairly and efficiently." (second alteration in original)).

Looking first at the request to certify Class B, the district court found that the invalidity of the Opt-Out Regulation permitted a defense based on prior express permission. Assaying the record, it then concluded that the need to adjudicate such a defense would require an examination of the circumstances of each class member and its communications with ACT to determine whether that class member gave the requisite permission. And the need to engage in such an individual inquiry meant that common issues would not predominate as required in order to certify a class under Rule 23(b)(3). See In re Asacol Antitrust Litig., 907 F.3d 42, 51-52 (1st Cir. 2018).

With proposed Class A, Bais Yaakov sought to eliminate this diversity among class members by limiting that class to recipients of unsolicited faxes. The district court rejected this attempt, finding that such a class would constitute a "fail-safe class," i.e., a class that would bind class members only if they won. See In re Nexium Antitrust Litig., 777 F.3d 9, 22 & n.19 (1st Cir. 2015). The district court then reasoned that if the class were redefined to include recipients of any faxes from ACT, it would suffer from the same defects as did Class B.

Having denied class certification, the district court turned to Bais Yaakov's individual claim, on which the parties had cross-moved for summary judgment. See Bais Yaakov of Spring Valley v. ACT, Inc., 438 F. Supp. 3d 106, 108 (D. Mass. 2020). The district court found that genuine disputes of material fact -- namely, whether the three faxes identified by Bais Yaakov qualified as advertisements and whether Bais Yaakov gave the requisite permission -- precluded granting summary judgment for either party. Id. at 109-10.

Later, ACT moved to dismiss Bais Yaakov's claim as moot. According to the district court, by that point ACT had "unconditionally tendered to [Bais Yaakov] all the statutory damages that it [sought] on an individual basis." Bais Yaakov of Spring Valley v. ACT, Inc., 461 F. Supp. 3d 3, 5 (D. Mass. 2020). As to injunctive relief, ACT had not sent Bais Yaakov a fax since

2012, and it had agreed not to send any faxes in the future in violation of the TCPA.  Id. at 4-5.  The district court therefore found the case moot and dismissed it.  Id. at 5.

Bais Yaakov now appeals three rulings of the district court:  the holding that the Opt-Out Regulation is invalid, the denial of class certification, and the dismissal of Bais Yaakov's individual claim as moot.  Bais Yaakov also asks us to review the district court's denial of its motion for summary judgment, but "[i]t is settled beyond peradventure that we lack jurisdiction to hear appeals from the routine denial of summary judgment motions on the merits."  Morse v. Cloutier, 869 F.3d 16, 31 (1st Cir. 2017).

## III.

We consider first the validity of the Opt-Out Regulation.  The parties argue at length over whether the decision of the D.C. Circuit finding the regulation invalid binds this court.  We sidestep that issue because we find the D.C. Circuit's decision -- whether binding or not -- correct, largely for the reasons cogently set forth in that opinion.  See Bais Yaakov, 852 F.3d at 1081-83; see also Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 624 n.11 (3d Cir. 2020) (declining to decide whether Bais Yaakov was binding on other circuits because it agreed with the D.C. Circuit's reasoning); Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc., 863 F.3d 460, 467 &

n.1 (6th Cir. 2017) (treating the D.C. Circuit's ruling as binding and separately agreeing with its reasoning); Nack v. Walburg, 715 F.3d 680, 682 (8th Cir. 2013) (noting that the FCC's authority to promulgate the Opt-Out Regulation was "questionable").

When a court reviews an agency's construction of a statute the agency administers, it conducts the familiar Chevron two-step analysis:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. . . . [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984) (footnote omitted). In Bais Yaakov, the D.C. Circuit stopped after the first step. 852 F.3d at 1082. It held that Congress had spoken directly about whether solicited fax advertisements required opt-out notices (giving the FCC no authority to issue a regulation on the matter), because the text of the statute explicitly required opt-out notices only on unsolicited fax advertisements and said nothing about requiring such notices on solicited fax advertisements. See id.; 47 U.S.C. § 227(b)(2)(C)(iii) (prohibiting the sending via fax of "an unsolicited advertisement, unless [among other things,] the

- 10 -

unsolicited advertisement contains a notice meeting the requirements under" another provision of the statute).

This reasoning makes good sense. The Supreme Court has directed courts to apply "traditional tools of statutory construction" in determining Congress's intent, Chevron, 467 U.S. at 843 n.9, and it is a "settled rule that [courts] must, if possible, construe a statute to give every word some operative effect," Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167 (2004). Moreover, in another subsection of the TCPA, Congress placed requirements not just on unsolicited fax advertisements but on "any communication" or "any message" sent via fax, 47 U.S.C. § 227(d)(1)(A), (B), demonstrating that when Congress wanted to regulate faxes broadly, it used broad language to do so. See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452 (2002) (explaining the "general principle of statutory construction" that courts presume Congress has acted "intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another section of the same Act" (quoting Russello v. United States, 464 U.S. 16, 23 (1983))). To read the statute as requiring opt-out notices on solicited advertisements would be to remove the word "unsolicited" from the provision discussing opt-out notices or to ink in new provisions discussing solicited faxes.

The panel dissent from the D.C. Circuit's opinion in Bais Yaakov criticized the majority for "fail[ing] to see the FCC's

- 11 -

rationale for requiring that all fax ads include an informative opt-out notice," which the agency had justified as an interpretation of what it means for a fax to be sent with "prior express invitation or permission" and therefore "solicited." 852 F.3d at 1083-84 (Pillard, J., dissenting). But, assuming that the FCC might justifiably conclude that a fax is not solicited within the meaning of the TCPA if the immediately preceding fax did not include an opt-out mechanism, we do not see how the agency reasonably could have concluded that a particular fax is unsolicited unless it itself contains an opt-out notice. And, even if the presence of an opt-out notice bears on whether the subsequently received fax is solicited, the first fax received after the recipient provides express permission cannot be considered unsolicited under any plausible construction of the term. Thus, as the FCC's rule applied to every fax sent, it required an opt-out notice on at least some faxes that were indisputably solicited and cannot be sustained as an interpretation of what "solicited" means. Nor is it our role to rewrite the regulation, even if one assumes that some alternative version might suffice.

Bais Yaakov argues, however, that our precedent compels a different understanding of whether the FCC has authority to require opt-out notices on solicited fax advertisements. It attempts to analogize to Alexander v. Treasurers of Boston

University, 766 F.2d 630 (1st Cir. 1985), a case concerning the so-called Solomon Amendment, which denied federal financial aid to students who were required to register for the military draft but failed to do so. Id. at 632. To implement the Amendment, the Secretary of Education obviously needed to know whether each financial aid applicant was required to register for the draft and, if so, whether the applicant had in fact registered. So the Secretary simply required each applicant as a condition of receiving aid to certify either that he or she was registered or was not required to register. Id. at 632-33. We found that requiring applicants for aid to indicate that they were eligible for that aid, with a "minimum of fuss and inconvenience," id. at 638, to be within the Secretary's authority to promulgate regulations so as to do the job Congress assigned it. "[T]he Secretary is simply saying that if an individual is unwilling to tell the government that he or she fulfills the conditions for aid, the government will not dispense it." Id. at 639.

The analogy to Alexander is unpersuasive. There, as explained, we concluded that, where the Secretary was uncertain whether a particular aid applicant was within the category of people who might be denied aid under the statute, it could impose a burden on that individual in the name of determining whether he or she was in fact within that regulable category. Here, Bais Yaakov asks us to hold something very different: that an agency

- 13 -

can regulate a particular type of fax that it knows with certainty is necessarily beyond its regulatory authority -- specifically, a first fax that is plainly a solicited one -- in order to determine whether a subsequently received fax does fall within the scope of its authority. Bais Yaakov has not explained why we can or should extend Alexander in that way. As such, the Opt-Out Regulation finds no haven in Alexander. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 91-92 (2002).

## IV.

## A.

We turn our attention next to Bais Yaakov's appeal of the district court's order denying class certification. In briefing that challenge, the parties sensibly train their arguments on the requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure, which states in pertinent part as follows: "A class action may be maintained if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

In practice, litigation over these requirements often reduces itself to a contest in which the party opposing certification points to issues that it claims will need to be decided separately for many class members. In turn, the putative

class representative tries to carry the burden of convincing the court either that prevailing on any of those issues is not important to obtaining the remedy sought, that the issues can be adjudicated in a manner that produces a common answer for all class members, or that, to the extent individual issues remain, they can be resolved in a manner that is both practicable and protective of the parties' rights. See Asacol, 907 F.3d at 51 ("The aim of the predominance inquiry is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" (quoting Amgen, Inc., 568 U.S. at 469)). "Inefficiency can be pictured as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues." Id. "Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues." Id. at 51-52.

True to form, ACT points to five issues allegedly central to the relief sought that ACT claims cannot be resolved fairly without an unmanageable need to consider the varying circumstances of individual class members. These issues are: (1) Did the school actually receive a fax from ACT? (2) Which fax did it receive? (3) Was the fax an advertisement when viewed in the circumstances of that recipient? (4) Does that school have the capacity to sue or belong to a class? and (5) Did the recipient of the fax

- 15 -

advertisement provide prior express permission for ACT to send the advertisement by fax?

The district court sidestepped the first four of these issues, training its attention on the fifth, the question of permission: Did a recipient of a faxed advertisement give ACT prior express permission to send the advertisement by fax? Under Class A, this issue must be resolved to determine even if someone is a class member (i.e., received an "unsolicited" fax). Under Class B, this issue must be resolved to determine whether ACT has a defense on the merits (i.e., that it received prior express permission to send the fax). 47 U.S.C. § 227(a)(5), (b)(1)(C). In either instance, the pivotal Rule 23 question is whether the record reasonably shows that some putative class members may have permitted ACT to send by fax what ACT faxed them and, if so, whether there is a fair and efficient method for culling those consenting recipients from the class. The district court found that ACT presented sufficient evidence that the class likely included members who invited ACT to send any materials by fax, and that to identify those members the court would have to "parse through each unique relationship" between every class member and ACT; hence, certification of Class B was precluded for lack of predominance.

As to Class A, the district court found that limiting the definition of class members to those who received "unsolicited"

- 16 -

faxes created a prohibited "fail-safe class," <u>Messner</u> v. <u>Northshore Univ. HealthSystem</u>, 669 F.3d 802, 825 (7th Cir. 2012), and that, in any event, no jiggering with the class definition would eliminate the need to decide the issue of permission (or solicitation) for each putative class member. We now review that decision, reversing only if we find an abuse of discretion (including any error of law). <u>Asacol</u>, 907 F.3d at 51.

**B.**

In deciding whether individual issues predominate over common questions, a court must not rely on mere speculation that individual issues may arise. See <u>Waste Mgmt. Holdings, Inc.</u> v. <u>Mowbray</u>, 208 F.3d 288, 298 (1st Cir. 2000); <u>Bridging Cmtys. Inc.</u> v. <u>Top Flite Fin. Inc.</u>, 843 F.3d 1119, 1125 (6th Cir. 2016) (concluding that the district court abused its discretion in finding that issues of consent predominated where the defendant "did not offer any information or evidence to support that theory"). Rather, it should consider only those issues that would likely arise if an individual class member's claims were being adjudicated on the merits. See <u>Mowbray</u>, 208 F.3d at 298; <u>Madison</u> v. <u>Chalmette Ref., L.L.C.</u>, 637 F.3d 551, 555 (5th Cir. 2011). In so doing, a court considers "the probable course of the litigation" so as to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate." <u>Mowbray</u>, 208 F.3d at 298. Even then, "the mere

- 17 -

fact that . . . concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." Id. at 296. To the contrary, "we have recognized that a class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both 'administratively feasible' and 'protective of defendants' Seventh Amendment and due process rights.'" Asacol, 907 F.3d at 52 (quoting Nexium, 777 F.3d at 19). So, here, we ask whether there is more than speculation that individual issues of permission may arise and, if so, whether Bais Yaakov has shown that those who gave ACT prior express permission to send advertisements can be culled from the class in a way that is administratively feasible and protective of ACT's due process rights.

We start with the fact that some unknown number of the putative class members sent a form to ACT providing a fax number and requesting that ACT send them ACT "publications." Indeed, Bais Yaakov itself both sent such a request and claims to be a typical member of the classes it seeks to represent. See Fed. R. Civ. P. 23(a)(3). Further, according to the declaration of an ACT official, class members routinely provided ACT with their fax number when inquiring about becoming a test center, requesting a High School Code number, seeking information about the dates the test will be administered, or asking for copies of publications.

At least two of the three faxed documents to which Bais Yaakov points as advertisements are notices of the exam dates and sign-up deadlines -- i.e., just the sort of information that a school asking for ACT publications would likely expect to receive by way of the fax number it supplied when asking for the documents. The third document, in turn, concerned the opportunity to administer ACT exams. And because the typical class member (e.g., Bais Yaakov) registered interest in giving such exams, one can easily see how a request by that school to receive ACT publications would cover such a document.

Nevertheless, as Bais Yaakov points out, the TCPA requires "express permission." "Express permission" means "[p]ermission that is clearly and unmistakably granted by actions or words, oral or written." Permission, Black's Law Dictionary (11th ed. 2019); cf. id. (defining "implied permission" as "permission that is inferred from words or actions"). Furthermore, FCC rules (unchallenged by either side) provide that in gauging whether express permission was provided, we consider the understanding of the recipient. In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14,014, 14,129 (2003) ("Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements."). So we do not reject the possibility that, notwithstanding the

strong inference to be drawn from supplying a fax number while requesting a publication, any given school may not have understood its communications to invite ACT to send by fax that which it sent. There is evidence, furthermore, that Bais Yaakov itself did not understand its request for publications to convey perpetual permission for ACT to send Bais Yaakov any advertisements. After all, Bais Yaakov objected when it received the faxed publications from ACT. And Bais Yaakov had no longstanding relationship with ACT that might have lent further support to the notion that it received by fax what it clearly asked to receive by fax. To the contrary, the record as described by the parties paints a picture of faxes sent to Bais Yaakov out-of-the-blue after years of no contact.

There is evidence, though, that other members of the putative class did not share Bais Yaakov's understanding concerning the express requests that they receive ACT publications. Indeed, ACT presented concrete examples of schools that did not share Bais Yaakov's understanding. These examples took the form of declarations from representatives of seventy-eight schools with whom ACT corresponded. The declarants confirmed that their schools provided ACT with fax numbers, and that they frequently requested and received publications from ACT by fax. When shown the three faxed ACT publications alleged by Bais Yaakov to be advertisements, they replied that the information contained

in the publications was "integral to" the school's ongoing interactions with ACT, and that "ACT would have had permission from the declarant or other school personnel" to send "these types of informational communications using any available type of communication, including facsimile."

Bais Yaakov makes no argument that the concrete examples offered by ACT did not exemplify a larger subset of similar class members that could only be identified were one to parse through the circumstances of each school in the putative class. The fact that many schools expressly asked when giving their fax numbers to receive ACT publications likely suggests why Bais Yaakov makes no argument that ACT's examples constitute just "a few unusual class members, who can be picked off by the defendant." Asacol, 907 F.3d at 57 (citing Halliburton v. Erica P. Jong Fund, Inc., 573 U.S. 258, 276 (2014)).

Rather, Bais Yaakov argues that ACT would have no plausible defense of consent even in the circumstances presented by the proffered examples. To support that argument, Bais Yaakov points out that the key sentence concerning permission to send the faxes employs the conditional "would have" formulation, rather than stating that ACT did in fact have permission to send the type of information contained in the faxes appended to the complaint. Certainly the syntax could have been clearer. But given the prior communication providing a fax number and asking to receive ACT

publications, we think that a factfinder could reasonably read the declarations as reflecting a lack of memory about whether the faxes were received, not a doubt about whether they were invited if received. A prior paragraph in each declaration explains that the declarant has been told that ACT might have sent to the recipient the three faxes appended to Bais Yaakov's complaint. Rather than claiming a rather remarkable memory about exactly what was received years ago, each declarant simply points to the faxes appended to Bais Yaakov's complaint and confirms that those faxes were the type of publications the school was requesting to receive by fax, and that ACT "would have had permission" to send them. In short, a factfinder could reasonably read the declarations as conveying the point that "I do not recall if ACT sent these specific faxes, but if it did, it would have had my permission to do so."

Bais Yaakov argues that the Seventh Circuit concluded otherwise in construing a recipient's declaration that the recipient "would have given" consent. Physicians Healthsource, Inc. v. A-S Medication Sols., LLC, 950 F.3d 959, 966 (7th Cir. 2020) (emphasis omitted). In so holding, it appears that the Seventh Circuit read the condition implied by that statement as "if asked, I would have given consent (but I was never asked)." While it may have been reasonable in the context of that case to read the statements as indicating that the recipients never gave

permission at all, here the context for at least some class members is markedly different.

Many schools were obviously trying to assist their students in taking the ACT test and, in many cases, in serving as test centers. As the schools' representatives explain, they therefore wanted information about "the nature of the test, how scores are used, how students can prepare for the test, test registration deadlines, and related topics." In this context, a factfinder could determine that the request for ACT "publications" was clearly understood by the school to be a request for notice of exam dates, deadlines for sign-ups, and -- in the case of test centers -- opportunities to give exams. This possibility finds reinforcement in some instances where a school, unlike Bais Yaakov, repeatedly requested information year in and year out. As best the parties' briefs reveal, Bais Yaakov was the only one of out of thousands of recipients that complained about receiving faxes from ACT. Silence is not express permission. But widespread and prolonged silence of this type strongly suggests that other recipients were more like ACT's examples than they were like Bais Yaakov.

Bais Yaakov points out (correctly) that the TCPA requires permission to send advertisements, not just faxes. To leverage that point, Bais Yaakov argues that the three subject faxes were advertisements. The declarations, though, deflect the

thrust of this argument because they expressly refer to the specific documents appended to the complaint. In short, even if we assume that these documents are advertisements, ACT would not incur liability if in the context of a particular relationship a request for ACT publications was clearly understood as an invitation to fax what was faxed. See Gorss Motels, Inc. v. Safemark Sys., LP, 931 F.3d 1094, 1100 (11th Cir. 2019) ("Although express permission requires a 'clear[] and unmistakabl[e] communicat[ion],' it does not require that a recipient state specifically that his permission includes faxed advertisements.").

On this record, we see no abuse of discretion in the district court's finding that there were, among the thousands of yet-to-be-canvassed putative class members, schools that could be found by the factfinder to have given the requisite permission. So that left a problem: How could one identify and cull out those who did give express permission to send what was sent?

Bais Yaakov has made no argument that the court could cull from the class the consenting schools in an administratively feasible way, protective of ACT's rights. Compare Sandusky Wellness Ctr., 863 F.3d at 469 ("Identifying solicited fax recipients through a form-by-form inquiry is sufficiently individualized to preclude class certification."), with Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 40 (1st Cir. 2003) ("Common issues predominate where individual factual

- 24 -

determinations can be accomplished using computer records, clerical assistance, and objective criteria -- thus rendering unnecessary an evidentiary hearing on each claim."). The district court therefore reasonably determined that individual issues of permission would predominate over common questions for both Class A and Class B. See Asacol, 907 F.3d at 51 (explaining that review of class-certification decision for abuse of discretion involves clear-error review of "'fact-dominated' issues" (quoting In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 17 (1st Cir. 2008))); Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 312 (1st Cir. 2019) (explaining that a "judge's choice between competing, but rational, views cannot be clearly erroneous" (citing Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985))).[2]

## C.

Bais Yaakov has asked that, were we to affirm the district court's denial of class certification, we should direct the district court to consider revising the class definitions as Bais Yaakov now proposes. As we have explained, Bais Yaakov had, in pertinent part, defined Class B as consisting of those whom ACT sent "a facsimile advertisement" and Class A as consisting of those

---

[2] We need not reach the question of whether Class A as defined initially by Bais Yaakov would nevertheless be rejected as a fail-safe class were there otherwise no predominance problem.

whom ACT sent "an unsolicited facsimile advertisement." In a footnote on the last page of Bais Yaakov's reply memorandum in support of its motion for class certification before the district court, Bais Yaakov suggested that, if necessary, the district court could narrow Class B to consist of those whom ACT sent "a facsimile whose content was identical or substantially similar to the content of any of the [three] facsimiles" Bais Yaakov says it received and that the district court could narrow Class A the same way but concerning an "unsolicited facsimile." Neither below nor on appeal has Bais Yaakov explained how these alternative definitions might cure the problems we have just discussed. Indeed, our discussion effectively assumed -- favorably to Bais Yaakov -- that each putative class member received those three documents from ACT via fax. In short, the proposed amendment would not eliminate the need to resolve individual issues of permission.

To summarize: The typical school sent ACT a form providing the school's fax number and expressly asking to be sent ACT publications. The documents ACT then sent in return to the supplied fax number appear on their face to provide just the sort of information that a school would want to receive after requesting ACT publications. These common facts raise quite a strong inference that the school sending such a form understood its request as inviting ACT to fax the documents that it faxed. After all, why supply the fax number and request ACT publications if not

to receive the publications by fax?  Bais Yaakov does have a point in arguing that its own circumstances may be found to belie any inference that it had any such understanding.  The faxes it received were sent seven years later, and it promptly objected.  But the evidence submitted by ACT makes clear that the circumstances of at least some other schools was to the contrary, actually reinforcing the strong inference that the forms sent to ACT were clearly understood and intended to be read as invites to send by fax that which was faxed.  Whether that is so in any individual case may be a close question which we need not resolve.  We hold simply that it is a genuine question that may well be answered one way or the other for any given school, and beyond arguing on the merits that no school gave permission to fax the documents -- an argument we have now rejected -- Bais Yaakov offers no means by which to answer that crucial question on a common basis.  Hence, the district court did not abuse its discretion in finding that the proposed classes could not be certified.

**V.**

We consider, finally, Bais Yaakov's appeal from the dismissal of its own individual claim as moot.  After denying Bais Yaakov's motion to proceed as a class action, the district court turned to the merits of the case, eventually denying in pertinent part contending motions for summary judgment on the questions of whether the three faxes appended to the complaint were

advertisements and whether Bais Yaakov had permitted ACT to send them by fax. ACT thereupon sent Bais Yaakov a check in the amount of $45,600, which Bais Yaakov does not dispute is the most that it can recover in this lawsuit. In a letter accompanying the check, ACT also promised to honor the check no matter the outcome of the case, and it offered to deposit the check with the district court, to be held until any appeal is completed and final judgment entered.[3] ACT also promised not to send Bais Yaakov any further faxes "that violate the TCPA," upon pain of paying "$1,500 should it send any such fax." The record also reflects that ACT has sent no faxes of any type to Bais Yaakov since 2012.

Bais Yaakov rejected the check and the accompanying promises. Unimpressed, the district court concluded that Bais Yaakov had received all that it could possibly receive as damages, and that it had no basis to obtain injunctive relief because "the allegedly wrongful behavior could not reasonably be expected to recur." Bais Yaakov, 461 F. Supp. 3d at 4 (quoting Am. C.L. Union of Mass. v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 55 (1st Cir. 2013)).

---

[3] The letter stated, "In all events, ACT hereby commits to paying $45,600 to Bais Yaakov, by way of the payment tendered with this letter or through other means as necessary at the conclusion of this litigation." It also stated that "this tendered payment is unconditional and irrevocable."

In this very lawsuit, we previously considered and rejected a prior attempt by ACT to moot the litigation by tendering an offer of judgment under Rule 68 of the Federal Rules of Civil Procedure. See Bais Yaakov of Spring Valley v. ACT, 798 F.3d 46 (1st Cir. 2015). In so doing we expressed concern about the threat to meritorious class actions posed by sanctioning efforts to cut off Rule 23 certification by mooting the individual claims of the named plaintiff. Id. at 48–49. Nevertheless, we also recognized uncertainty regarding the weight attributed by the Supreme Court to such a concern. Compare Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980) ("Requiring multiple plaintiffs to bring separate actions, which effectively could be 'picked off' by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions."), with Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 78 (2013) (describing that line from Roper as dicta and explaining that Roper's holding turned on the named plaintiff "possess[ing] an ongoing, personal economic stake in the substantive controversy -- namely, to shift a portion of attorney's fees and expenses to successful class litigants"). So we ultimately based our rejection of the Rule 68 pick-off gambit on a prediction that the Supreme Court would find that a rejected Rule 68 offer provides no actual relief. See Bais Yaakov, 798 F.3d at 52.

The Supreme Court has since held just that: "An unaccepted settlement offer -- like any unaccepted contract offer -- is a legal nullity, with no operative effect." Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 162 (2016) (quoting Genesis Healthcare, 569 U.S. at 81 (Kagan, J., dissenting)). So the question before us is whether there is good reason to reach a different result when a check, rather than a Rule 68 offer, is tendered.

The precedent is admittedly uncertain and sparse on this subject. After all, not many plaintiffs walk away from an offer to pay 100% of what they seek. Nevertheless, there are reasons to conclude that ACT's tender of a check and associated promises did not moot Bais Yaakov's claims. Bais Yaakov's self-interest in appealing the denial of class certification might have been reason enough depending on how well Roper stands up in light of Genesis, see Campbell-Ewald, 577 U.S. at 165 ("While a class lacks independent status until certified, a would-be class representative with a live claim of her own must be accorded a fair opportunity to show that certification is warranted." (citation omitted)), though we have now concluded the district court did not err in denying class certification. In any event, as Justice Thomas pointed out, at common law unconditionally offering funds while still denying liability is not a tender that requires the end of a lawsuit. Id. at 170-71 (Thomas, J., concurring in the judgment). Most narrowly, the transmittal of an

ordinary check does not differ for present purposes from an offer to pay: The recipient has a promise, but no funds. As the ancient proverb goes, "[t]here's many a slip 'twixt the cup and lip." 4 The Greek Anthology 21 (W.R. Paton trans., 1918). Indeed, the Rule 68 offer at least conveys the ability to obtain a judgment, while the check conveys only a hope that the bank account will have the promised funds. Cf. id. at 166 (majority opinion) (reserving judgment on whether a deposit of funds with the court and entry of judgment in the amount of those funds would moot the case); id. at 186 & n.2 (Alito, J., dissenting).[4] So, as best we can tell, Bais Yaakov's damage claim is not moot.

Finally, there is Bais Yaakov's request for injunctive relief. We find no error in the district court's finding that ACT's cessation of sending faxes to Bais Yaakov since 2012, its deletion of Bais Yaakov's fax number from ACT's database, and its admission that any further faxing to ACT would render ACT liable, all combine to establish that ACT's allegedly wrongful behavior as to Bais Yaakov "could not reasonably be expected to recur." Bais

---

[4] Compare Chen v. Allstate Ins. Co., 819 F.3d 1136, 1144–46 (9th Cir. 2016) (reasoning that the defendant's deposit of the full amount of plaintiff's claims in an escrow account did not moot the plaintiff's claim since the plaintiff had not "actually or constructively received" the money), with Leyse v. Lifetime Ent. Servs., LLC, 679 F. App'x 44, 48 & n.2 (2d Cir. 2017) (summary order) (concluding that the district court properly entered judgment on the plaintiff's individual claim where the defendant deposited the full amount recoverable by the plaintiff with the clerk of court).

Yaakov, 461 F. Supp. 3d at 4 (quoting Am. C.L. Union of Mass., 705 F.3d at 55).

Bais Yaakov makes no other argument that its individual claim for injunctive relief should survive if we both affirm the denial of class certification and find no error in the district court's finding that Bais Yaakov cannot reasonably be expected to receive any more faxes from ACT after eight years of silence and the express assurances tendered.

## VI.

For the foregoing reasons, we affirm the district court's denial of class certification and its dismissal of the claim for injunctive relief. We otherwise vacate the judgment and remand for further proceedings.

**- Concurring Opinion Follows -**

**BARRON**, <u>Circuit Judge</u>, **concurring.** This case raises a question like the one that we confronted in <u>In Re Asacol Antitrust Litig.</u>, 907 F.3d 42 (1st Cir. 2018): Does Federal Rule of Civil Procedure 23's predominance requirement permit certification of a class whose members could prove their claim -- at least in part -- only through individual testimony? It is easy enough to see why the answer might be, "No." How will common rather than individualized issues predominate after certification if each class member's claim depends on testimony as individualized as, to take this case as an example, whether the class member had expressly agreed to receive a fax from the defendant before the defendant sent it?

This case also results in the same answer to that question that we gave in <u>Asacol</u>: The class certification request must be denied on predominance grounds because the defendant has made a seemingly credible promise to challenge the testimony that each class member would give if required to do so at a trial on that issue. Thus, here, as there, we reject a class certification request on predominance grounds, despite the important role that a class action would play in making meaningful relief possible for the defendant's alleged wrongs.

It is safe to assume that our "predominance" holding in this case will not go unnoticed. District Court judges in our Circuit thoughtfully expressed the concern in the wake of <u>Asacol</u>

that we had construed the predominance requirement there too strictly.  See, e.g., In re Loestrin 24 FE Antitrust Litig., 410 F. Supp. 3d 352, 403-04 (D.R.I. 2019) (Smith, C.J.); In re Intuniv Antitrust Litig., No. 1:16-cv-12396, 2019 WL 3947262, at *7 n.8 (D. Mass. Aug. 21, 2019) (Burroughs, J.).  Our reliance on Asacol here may increase the concern that we are mistakenly construing the predominance requirement to render Rule 23, at least in certain important categories of cases, incapable of protecting "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997) (quotation marks omitted); see also In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 8 (1st Cir. 2008) ("[A]n erroneous failure to certify a class where individual claims are small may deprive plaintiffs of the only realistic mechanism to vindicate meritorious claims.").

Nonetheless, I continue to think that our decision in Asacol was right, and I am in full agreement with my colleagues that it requires that we affirm the District Court's denial of the motion to certify the class in this case.  I write separately, though, to emphasize the limits on the scope of our holding in

Asacol and to explain how our holding in this case accords with them.

Asacol's limits are worth highlighting because they convince me that the concern that we are unduly cutting back on Rule 23 through our construction of the predominance requirement is misplaced, or, at least, premature. The current state of our precedent does not preclude certification in cases in which the putative class members' claims depend on an individualized means of proof just because the defendant has vowed to challenge each class member's showing at trial if the request for class certification is granted. Instead, as I will explain, our precedent in this area leaves open various viable means by which a putative class can satisfy the predominance requirement in such cases even if the defendant makes that promise about its litigation strategy going forward.

**I.**

Before Asacol, we had decided a very similar case: In re Nexium Antitrust Litig., 777 F.3d 9 (1st Cir. 2015). A review of Nexium's own limitations -- and how Asacol responded to them -- helps to place our precedent in this area in its proper context.

The named plaintiffs in Nexium were suing AstraZeneca, which was the holder of several patents related to the anti-heartburn drug Nexium, as well as several of its generic pharmaceutical competitors. Id. at 13-14. The named plaintiffs

alleged that the defendants had violated state antitrust laws by entering into agreements not to compete with three generic drug manufacturers and that, as a result, AstraZeneca had overcharged for Nexium between 2008 and 2014.  Id.  The named plaintiffs also sought certification of a class consisting of all persons or entities who had purchased Nexium during that six-year period (with certain limitations unnecessary to enumerate here).  Id. at 14.

The defendants objected to the certification of the proposed class on the ground that expert evidence showed that it contained "some number of brand-loyal consumers who would [have] continue[d] to purchase branded Nexium even when a generic bec[ame] available."  Id. at 20.  The defendants argued that "the [brand-loyalist issue] present[ed] problems that [the] plaintiffs [could not] overcome, for [the] plaintiffs ha[d] no methodology to identify . . . those consumers who would have switched to a generic version."  Id. (first alteration in original).

The Nexium defendants were in part mounting a "categorical challenge" to the bid for class certification on the ground that "the hypothetical nature of the inquiry into [antitrust] injury . . . turned on what was necessarily speculation about a plaintiff's . . . [individual] purchasing preference."  Asacol, 907 F.3d at 59-60 (Barron, J., concurring).  Nexium rejected that aspect of the defendants' challenge, because an individual class member could prove the defendant's

- 36 -

anticompetitive conduct caused injury under the applicable state antitrust law through "testimony . . . that, given the choice, he or she would have purchased the generic." Nexium, 777 F.3d at 20.

Nexium explained that "[s]uch testimony, if unrebutted, would be sufficient to establish injury in an individual action." Id. It further explained that, because "[t]here cannot be a more stringent burden of proof in class actions than in individual actions," "similar testimony in the form of an affidavit or declaration would be sufficient in a class action" to prove the alleged antitrust injury. Id.

The Nexium defendants did also argue that the contemplated affidavits could not save the class certification request because, under Rule 23's predominance requirement, "any mechanism of [proving injury] that requires determination of the individual circumstances of class members is improper." Id. at 21. But, Nexium rejected this ground for denying class certification as well.

Nexium emphasized that "the Supreme Court . . . and the circuits in other cases have made clear that the need for some individualized determinations at the liability and damages stage does not defeat class certification." Id. (citing Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013)). Moreover, the defendants had not asserted that they would -- let alone that they feasibly could -- challenge the claims of antitrust injury,

class member by class member, at trial in the event of class certification, as the defendants had not at any point asserted that they would challenge the class members' affidavits if submitted. See Asacol, 907 F.3d at 52.

Thus, although Nexium affirmed certification of the class at issue there, it did not hold that a putative class could always fend off a defendant's predominance-based challenge just by offering to submit affidavits previewing how the class members would testify at trial. Nexium held only that such affidavits could allow the putative class to defend against such a challenge to certification if the affidavits were unrebutted.

It was against this backdrop that we then decided Asacol. There, we once again addressed a request to certify a class made up of individuals claiming an injury under state antitrust laws premised on the defendants' allegedly anticompetitive efforts to keep a cheaper generic off the market. Id. at 44-45.

The proponents of class certification in Asacol invoked Nexium to explain why affidavits from members of the putative class attesting to their willingness to buy the generic would solve any predominance problem. See id. at 52. But, we concluded that Nexium did not support the certification request. See id. at 52-53.

We explained that the Asacol defendants had done exactly what the defendants in Nexium had not. In addition to putting

forth expert evidence showing that some class members were brand loyal (though without identifying any specific individuals who were), the Asacol defendants had "expressly stated their intention to challenge any affidavits that might be gathered" from class members asserting that they would have bought the generic drug had they been given the choice to do so. Id. at 52.

We acknowledged that "'unrebutted testimony' . . . in an affidavit could be used prior to trial to obtain summary judgment, thereby efficiently and fairly removing the issue of injury-in-fact from the case for trial." Id. (quoting Nexium, 777 F.3d at 21). But, we pointed out, "[t]estimony that is genuinely challenged, certainly on an element of a party's affirmative case, cannot secure a favorable summary judgment ruling disposing of the issue." Id. at 53 (emphasis added).

We thus concluded that it was dispositive of the predominance issue that those seeking class certification in Asacol had offered no response to the defendants' assertion that they intended to challenge any affidavits that might be produced by class members denying their brand loyalty. See id. at 52-54. The class would not be able to "rely on unrebutted testimony in affidavits to prove injury-in-fact" as the case unfolded post-certification. id. at 53. That being so, the contemplated affidavits could not preclude the need for mini-trials on the merits of the disputed issue concerning injury. It therefore

followed that the putative class could not rely on the affidavits to surmount the defendants' predominance-based objection to class certification, given the number of plaintiffs who seemingly would have had to take the stand post-certification if the defendants pressed their Seventh Amendment and due process rights to the end. See id.

Asacol was no more categorical in denying certification on predominance grounds, however, than Nexium had been in granting certification in the face of a predominance challenge. Asacol did hold that the predominance requirement could not be satisfied in the face of a defendant's asserted intent to press its rights all the way through trial. But, it did so in a case in which the putative class had offered no basis for deeming that threat to be, in effect, an empty one. See id. at 61 (Barron, J., concurring) ("[T]he plaintiffs do not argue that the defendants would be incapable of mounting effective challenges to any, let alone to most, of the plaintiffs' affidavits at summary judgment. Nor may we conclude that the plaintiffs would only need to rely on individualized proof of injury for a small identifiable subset of the class . . . .").

In light of this important limitation on Asacol's holding, its primary significance in my view is not to be found in the outcome in that specific case. It is to be found in the structure of the inquiry that it required a district court to

undertake in every case in which it must determine whether a putative class can satisfy the predominance requirement.

Asacol makes clear that to assess predominance a district court must consider, in a realistic but rigorous manner, how a trial would proceed in the event of certification. Asacol thus requires a district court, in undertaking that assessment, to make a prediction about what would happen post-certification if the defendant were to follow through and challenge the claims of the putative class members by asking whether certification would result in, as we put it then, inefficiency (which "can be pictured as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues") or unfairness (which can be "pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues"). Id. at 51-52.

Importantly, then, Asacol leaves open the possibility that a district court's predictive assessment might not paint the concerning picture of how the post-certification litigation would unfold (even assuming no settlement) that would preclude certification of a class on predominance grounds. Accordingly, I understand Asacol to leave open the possibility that the predominance requirement might be met even in a case involving a

claim in which the members of the putative class must rely on a means of proof that is individualized.

## II.

We come, then, to the case at hand. Here, we once again conclude on predominance grounds that the proposed class cannot be certified. But, in doing so, we break no ground that Asacol did not already break.

As in Asacol, the claim of class members in this case depends on knowledge that is specific to each one: here, whether the class member provided advance permission to receive the kind of fax at issue. As in Asacol, the defendant in this case has vowed to contest each class member's claim on that highly individualized issue, thereby suggesting that each such member will have to provide individualized testimony -- one by one -- at trial on it. And, as in Asacol, the proponent of class certification here has not explained how the evidentiary realities on the ground undermine the defendant's assertion that it can force a trial on the disputed issue as to each class member.

Indeed, if anything, the defendant's promise to contest the class-member testimony at trial post-certification is even more credible here than it was in Asacol. It comes supported by affidavits of the defendant's own from class members. Yet, the proponent of certification, Bais Yaakov, has failed to identify a persuasive ground for doubting the defendant's showing that a

stream of mini-trials likely awaits on the other side of certification.

True, Bais Yaakov contests the significance of the undisputed evidence that thousands of schools had asked for ACT to send them publications while supplying it with a fax number. Bais Yaakov responds that, because the recipient's prior consent to receiving a faxed advertisement is an affirmative defense that the defendant bears the burden of proving, that evidence does not suffice to show that issues of consent would have to be adjudicated class member by class member at trial. Bais Yaakov relies for that contention on the TCPA's requirement that the defendant show that there was <u>express</u> permission given in advance applicable to each advertisement that it faxed.

It is far from clear that requirement in the TCPA would spare an individualized inquiry into the nature of a class member's relationship to ACT. But, even if we assume that the TCPA makes the bar for establishing the express-permission defense as high as Bais Yaakov construes it to be, there remains the fact that ACT has introduced affidavits from seventy-odd schools to bolster its predominance case. ACT contends that those affidavits show that those schools did expressly consent to the receipt of such faxes

- 43 -

when they requested publications from ACT while supplying their fax numbers to it.

Bais Yaakov does not attempt in response to make anything of the fact that these affidavits concern only seventy-odd schools -- and thus merely "a small identifiable subset of the class's members."[5] In re Asacol Antitrust Litig., 907 F.3d 42, 61 (1st Cir. 2018) (Barron, J., concurring). For example, Bais Yaakov makes no argument that ACT "would be incapable of mounting effective challenges" to a non-de minimis number of class members' claims, id. (Barron, J., concurring), because speculation alone supports the notion that ACT would be able to obtain either additional affidavits beyond those that it has produced or any similar evidence that could suffice to create a genuine issue of disputed fact as to whether those class members consented to receiving the faxes, id. at 53 ("Nor have the plaintiffs provided any basis from which we could conclude that the number of affidavits to which the defendants will be able to mount a genuine challenge is so small that it will be administratively feasible to require those challenged affiants to testify at trial."); see also id. at 52-53 ("Nor do plaintiffs point to any basis in the record for deeming all such challenges [by the defendants] to be so

---

[5] ACT's records indicate that it sent more than 28,355 fax advertisements between June 30, 2008, and June 30, 2012. Bais Yaakov of Spring Valley v. ACT, Inc., 328 F.R.D. 6, 9 (D. Mass. 2018).

- 44 -

implausible as to warrant a finding that we can consider the issue to be uncontested.").

In fact, Bais Yaakov's only argument with respect to the affidavits from school officials is that none shows that even those officials' own schools gave the requisite prior express permission. But, as we explain, that contention is not tenable, given what those affidavits indisputably show.

As a result, much like in Asacol itself, the proponent of certification here has failed to explain how the claim of each class member could be dealt with post-certification in a manner that would not be "inefficient or unfair." Id. at 51. Thus, because the proponent of class certification bears the burden of satisfying the predominance requirement, In re Nexium Antitrust Litig., 777 F.3d 9, 18 (1st Cir. 2015), we must reject this request for class certification just as we rejected the one in Asacol.

## III.

For the reasons set forth above, it is clear to me that our decision today does not extend Asacol beyond its own limits. But, I do think it is important not to lose sight of the reasons for those limits. Attending to them will ensure that neither Asacol nor this case is understood to impose a greater bar to class certification than it does.

For one thing, I understand the limited nature of Asacol's predominance holding to reflect a recognition that even

in an individual action involving a claim that necessarily depends on individualized testimony, the plaintiff may be able to secure summary judgment in her favor based on an affidavit previewing that testimony. After all, a defendant in an individual action cannot defeat a motion for summary judgment predicated on an affidavit previewing the plaintiff's testimony merely by asserting that it will contest that testimony at trial. See In re Asacol Antitrust Litig., 907 F.3d 42, 53 (1st Cir. 2018). The defendant must make a showing at the summary judgment stage that suffices to put the contents of the plaintiff's affidavit in doubt. See Triangle Trading Co. v. Robroy Indus., 200 F.3d 1, 2 (1st Cir. 1999) (explaining that "[c]onclusory allegations, improbable inferences, and unsupported speculation" cannot give rise to a genuine issue of disputed fact (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996))).

For another thing, I understand the limited nature of Asacol's predominance holding to reflect a recognition that a class cannot be held to a higher standard in moving for summary judgment than the standard to which its members would be held in moving for summary judgment in individual actions of their own. See id. at 52; Nexium, 777 F.3d at 20 ("There cannot be a more stringent burden of proof in class actions than in individual actions."); see also Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 456-57 (2016) (allowing a class to rely on representative statistical

evidence because each member "likely would have had to introduce [that] study" if the members "had proceeded with 3,344 individual lawsuits"). Thus, I understand Asacol to recognize that, if an individual class member could win at summary judgment on an issue dependent on individual testimony and central to the claim in her own individual action, that class member also could do so on the strength of that same showing as a member of a class made up of numerous individuals.

Accordingly, I understand Asacol to be in line with our prior precedent recognizing that when a district court assessing predominance "supportably finds that an issue which, in theory, requires individualized factfinding is, in fact, highly unlikely to survive typical pretrial screening (such as a motion to strike or a motion for summary judgment), a concomitant finding that the issue neither renders the case unmanageable nor undermines the predominance of common issues generally will be in order." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000) (emphasis added).[6] After all, due to the lack of any need for a

---

[6] It is worth noting that the inquiry that I contemplate a district court undertaking here is not particularly novel, even in the class action context. As to any request to certify a class, the district court must assess whether the class definition is sufficiently "definite" so as to "allow the class members to be ascertainable." Nexium, 777 F.3d at 19. In Nexium, we concluded that the proposed class "satisfie[d] th[at] standard[] by being defined in terms of purchasers of Nexium during the class period," id., even though the determination of whether any particular

- 47 -

"mini-trial on the issue" in that circumstance, Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 477 (2013), the concerning picture that Asacol paints of long lines of plaintiffs waiting to give testimony at the courthouse will fade to black.

Because of this understanding of Asacol, I do not read it to hold that a putative class may surmount a defendant's predominance-based challenge to certification only by showing that class members are entitled to invoke a presumption in their favor on the individualized aspect of their claim that the defendant vows to dispute at trial. Asacol did recognize that in Halliburton Co. v. Erica P. John Fund, the Supreme Court relied on the existence of such a legal presumption in rejecting a predominance-based challenge to certification, see Asacol, 907 F.3d at 53 (citing Halliburton, 573 U.S. 258 (2014)). And, in rejecting the request for class certification in Asacol, we did note that the putative class members there were not entitled to any presumption regarding their willingness to purchase a generic under the state antitrust laws that supplied their causes of action. Id.

But, a closer look at Halliburton's logic suggests that the entitlement to invoke a presumption like the one that applied

---

individual falls within that class is an inherently individualized one that the defendants there in theory could have contested. Yet, we expressed no concern -- and no one argued -- that this feature of the inquiry on its own automatically destroyed the efficiencies that make class actions a valuable procedural device.

there may not be a prerequisite to a putative class satisfying the predominance requirement in the face of a defendant's assertion that the putative class's underlying claim can be proved only through individualized testimony from each class member. Nor does Asacol, as I read it, indicate that it adopted a different understanding of Halliburton on that score.

The Supreme Court in Halliburton considered a request for certification of a class of those alleging that Halliburton Co. had violated section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 by making a series of material misrepresentations to try to inflate its stock price. 573 U.S. at 264. The Court had held in a prior case, Basic Inc. v. Levinson, 485 U.S. 224 (1988), that "requiring . . . direct proof of reliance [in such an individual securities fraud action] 'would place an unnecessarily unrealistic evidentiary burden on the [investor],'" because the investor would "have to 'show a speculative state of facts, i.e., how he would have acted . . . if the misrepresentation had not been made.'" Halliburton, 573 U.S. at 267 (fourth alteration in original) (quoting Basic, 485 U.S. at 245). Basic thus had held that investors could "invok[e] a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the

- 49 -

market price may be considered to have done so in reliance on the misrepresentation." Id. at 283-84.

The putative class in Halliburton pointed to this presumption of reliance as a reason to reject the predominance-based challenge to class certification that the defendants were pressing in that case. See id. at 265-66. The notion was that the crucial issue of class member reliance on the defendants' alleged misinformation could be proved on a class-wide basis -- rather than class member by class member through individualized testimony at trial -- in consequence of the presumption of reliance that Basic had recognized each class member was entitled to invoke. See id. at 267-68.

In considering that contention, Halliburton did note that there were features of the presumption that arguably favored the defendants' position regarding predominance. For example, "Basic [had] emphasized that the presumption of reliance was rebuttable rather than conclusive," id. at 268, and that a defendant could defeat that presumption by making "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [the plaintiff's] decision to trade at a fair market price," id. at 269 (first alteration in original) (quoting Basic, 485 U.S. at 248).

But, the Court ultimately held that there was no predominance-based reason to deny class certification. The

defendant's "opportunity to rebut the presumption of reliance" on an "individual" basis did have, according to the Court, "the effect of 'leav[ing] individualized questions . . . in the case.'" Id. at 276 (first alteration in original) (quoting id. at 295 (Thomas, J., concurring in the judgment)). Nevertheless, the Court explained, that was "no reason to think that these questions w[ould] overwhelm common ones." Id. For, while the Court acknowledged that a defendant might be able to show that an individual class member "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud," id. at 269, it determined that the prospect "[t]hat the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." Id. at 276.

Halliburton in this respect may be understood to have determined that it would be -- to use our own way of putting the point -- "highly unlikely" that a defendant would have much luck puncturing an otherwise unrebutted case for finding investor reliance in such a securities fraud case. See Waste Mgmt. Holdings, Inc., 208 F.3d 288, 298 (1st Cir. 2000). But, if so, then there is no reason why, in principle, a court could not make a similar assessment based on the prospect of affidavits previewing

class member testimony in certain types of case in which no such presumption applies.

Of course, the defendant in a case of that kind would still have the "opportunity," Halliburton, 573 U.S. at 276, to make a responsive showing that would suffice to establish at the certification stage that after certification were granted it would be able to create a genuine dispute of material fact as to the putative class members' claims, despite the affidavits previewing their testimony on the critical issue. But, the defendants in Halliburton had a similar opportunity in that case to cast doubt on the putative class members' claims -- supported by the presumption recognized in Basic -- to have relied on misleading investment information. And yet the Court did not think that bare possibility a reason to conclude that individualized issues would predominate, as it implicitly predicted that it would be difficult for a defendant to produce evidence that could cast doubt on the reliance of more than "the occasional class member here or there." Id.

Of course, even when the putative class points to the affidavits from class members that it could use to secure summary judgment on the disputed issue, the defendant may well find it quite easy at the certification stage to demonstrate that there is a predominance problem nonetheless. A defendant might have business records that suffice to permit it to do just that. Or,

it might even have affidavits from putative class members -- as ACT has here -- that are representative of more than a de minimis chunk of the class and that thus would suffice to put a substantial number of the class members' own affidavits in doubt.

In other cases, though, a defendant might turn out to have a difficult time identifying evidence of that kind at the certification stage. Halliburton itself is, of course, an example of a case in which, by virtue of a strong presumption, that was so. But, even in a case involving a claim akin to the ones in Nexium or Asacol, for which no similar presumption applies, it may not be easy for the defendant to demonstrate that there is a predominance problem.

A plaintiff's representation about how it would have acted if the world had been different than it was (such as a consumer's testimony about whether she would have purchased a generic drug cheaper than the brand-named one that she had previously used) is, by its nature, not easily undermined. It is thus not clear to me how a defendant could show that it would be able to genuinely challenge such a representation post-certification if faced with the prospect of affidavits from class members attesting to something so peculiarly within their own knowledge.

True, a defendant in a case similar to Asacol could respond to the prospect of affidavits disclaiming brand loyalty by

pointing to class members' health plan purchasing records. But such documents might merely highlight that a class defined by price-sensitive health plans -- indicating a lack of brand loyalty -- would still be a viable one. See Asacol, 907 F.3d at 61 (Barron, J., concurring).

I also do not understand our precedent to this point to establish that a defendant's invocation of expert statistical evidence about the presence of uninjured class members materially changes the analysis that a district court must undertake. In Asacol, the district court did find based on expert testimony that approximately ten percent of the putative class was brand loyal and thus uninjured, 907 F.3d at 46-47, and we then held that this evidence indicated that the inherently individualized issue of brand loyalty presented a predominance concern, given the "needle in a haystack" problem, id. at 61 (Barron, J. concurring). But, we did not go on to suggest that such statistical evidence sufficed on its own to establish that the individual class members would not have been able to obtain summary judgment as to the issue of brand loyalty had they introduced affidavits attesting that they would have been willing to buy the cheaper generic if it had been available. Such statistical evidence would neither have established that any single class member was personally brand loyal nor even provided a basis for finding by a preponderance that any one of them was. See Nexium, 777 F.3d at 20; see also Tyson Foods,

Inc. v. Bouaphakeo, 577 U.S. 442, 458 (2016) (explaining that the introduction of representative evidence in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011), "would have violated the Rules Enabling Act by giving plaintiffs and defendants different rights in a class proceeding than they could have asserted in an individual action"); cf. Charles Nesson, The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts, 98 Harv. L. Rev. 1357, 1378-80 (1985) (explaining the "blue bus hypothetical," in which a plaintiff loses in his suit against the Blue Bus Company before reaching the jury because a "factfinder c[ould] only conclude from the plaintiff's evidence that there was an 80% chance that he was injured by the Blue Bus Company and a 20% chance that he was not").

## IV.

I do not seek here to define with any precision the showing at the certification stage that a defendant must make in the face of an assertion by the proponent of certification that common questions will predominate. I also do not seek here to define precisely the showing that the certification proponent must make to rebut the defendant's contention that common issues will not. Nor, finally, do I mean to catalog the specific types of

cases that are more or less susceptible to being challenged on predominance grounds.

The reviewing court's task when it comes to the predominance requirement is to make a reasoned judgment about how the litigation would proceed in the event of certification. It must make that judgment by predicting how many individual mini-trials would be required if the class were certified, which in turn entails a forecast about whether it is "highly unlikely" that the defendant will be able to stave off a post-certification motion for summary judgment. Waste Mgmt. Holdings, Inc., 208 F.3d 288, 298 (1st Cir. 2000). The showing required of both the putative class and the defendant at the certification stage as to predominance thus will necessarily vary from case to case, in line with the nature of the underlying claim and the type of issue that it requires class members to prove through individualized showings. The summary judgment standard is such that I do not hazard more categorical observations.

Still, the showings must have enough substance to them to permit the court to engage meaningfully in the required predictive exercise. And, in determining how much substance is enough, it is important to keep in mind both that the district court's judgment on that score is entitled to deference, see In re Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018) (reviewing the certification decision for abuse of discretion), and that a

certifying court will have an opportunity to revise that determination if in reality proceeding as a class proves unworkable, Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

It is also important to keep in mind that we have never indicated that, in a case where affidavits from class members are required to show that they can prove their claim, it would be an abuse of discretion for a district court to certify a class unless the putative class has already in fact collected and introduced those affidavits into the record. See In re Nexium Antitrust Litig., 777 F.3d 9, 20-21, 24 (1st Cir. 2015). Nor is there anything in our case law to indicate that a defendant must actually collect and introduce at the certification stage all of the evidence on which it would rely in the merits phase, including the evidence it would introduce in order to oppose summary judgment. Indeed, I would be concerned that requirements to that effect would conflict with the principles that undergird Rule 23(b)(3), and upset the careful balance that the (b)(3) class action procedure strikes between efficiency of litigation and fidelity to a defendant's due process and Seventh Amendment rights. See Asacol, 907 F.3d at 51-52; see also Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment ("Subdivision (b)(3) encompasses those

cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.").

That said, a review of the state of our precedent in this area reveals to me that there is still much to be decided when it comes to the predominance requirement, notwithstanding our important holdings to date establishing the applicable framework that must be used to decide future cases implicating it. For that reason, while I join the majority in full in affirming the District Court's denial of certification for this class, just as I joined the majority in Asacol itself, I think it important to emphasize here, as I thought it important to emphasize there, the limited nature of our holding in this case. For, I am confident that, as a consequence of this decision, our current precedent in this area continues to ensure that viable opportunities remain for securing class certification in cases involving claims that inherently depend on highly individualized means of proof, no matter how intently a defendant may represent at the certification stage that it wishes to contest those means at any trial that might ensue.